MARTHA BRADSTREET, *demandant*, *vs.* GEORGE CLARKE,
*tenant.*

Where a devisor in and by his last will and testament *devised* and bequeathed
all his estate real and personal to *two daughters*, equally to be divided be-
tween them as tenants in common, *in fee*, charging the same with an annuity
to their mother during her life, adding " notwithstanding the former devise
for the benefit of my wife and daughters, *I empower my executors* to do all
acts and execute all instruments which they may consider requisite to the
partition of my *landed estate*, and I *devise the same to them as joint tenants,*
to be by them sold at such time and in such manner as they shall think most
for the interest of my daughters, to whom the nett produce shall be paid in
equal shares : the sum of £100 sterling per annum being first deducted, or a
capital to secure the same set apart for an annuity to my wife as aforesaid ;"
IT WAS HELD, that the devise to the executors gave them a *legal estate in fee :*
that they took such estate not only by virtue of the terms *estate* or *landed*
estate employed in the will, but by *necessary implication* from the power
given to them to sell and dispose of the property.

The word *heirs* is not necessary to the carrying of a fee in a *will*, although it
is indispensable for that purpose in a *deed :* any other terms or provisions,
clearly indicating the intention of the testator, are sufficient.

*It was further held*, that under the provisions of this will it must be deemed
to have been the *intent* of the testator that the *title* to his landed estate
should vest in his *executors* and not in his *daughters.*

Where the provisions of a will in the disposition of property are so *repugnant*
that they cannot stand together, the latter provision will prevail.

*It was further held*, that it was competent to the *surviving executor* of such
will to grant and convey to a person *acting as the attorney*, of an *executor*
of one of the daughters of the devisor, who was authorized by the will of
such daughter to sell and dispose of all that portion of the estate of the first
devisor which, by his will, was given to her ; such conveyance to such at-
torney being *in trust* to sell the property and divide the proceeds, in con-
formity with the provisions of the will appointing his principal executor ;
*and it was further held*, that by such conveyance the *legal estate* passed to
the grantee, *subject to the trusts* declared in the will of the first devisor, set
forth in such conveyance.

Where a *devisee* of such daughter of the first devisor filed a bill in chancery
against such *grantee* of the *surviving executor*, and obtained a decree direct-
ing the grantee to transfer and convey unto her *all the real estate vested in
him as trustee*, &c. the terms of the conveyance to be settled by a master,
who was directed to take and state an account between the parties ; and
by the decree, such grantee was exempted from all *personal responsi-
bility* for any of the trust property which had been converted into money,
and a conveyance was accordingly executed, setting forth the *conveyance*
to such grantee from the surviving executor of the first devisor, *and the*

*decree* in chancery, and then conveying all the estate held by him *as trustee;* and such a decree and conveyance were *produced in evidence* by such devisee, on the trial of a *writ of right,* sued out by her for the recovery of lands belonging to the original devisor, IT WAS HELD, that the demandant in such writ of right was *estopped* from denying that the grantee of the surviving executor was the *attorney* of the *executor* of the will of the testator under whom she claimed, and that he took under the deed to him all that it professed to convey *in trust,* &c. and that she was so estopped, notwithstanding that at the time of the filing of the bill she was a *feme covert.*

A *trustee* of real estate, with *power to sell,* may convey without setting forth the trusts under which he holds, and a conveyance by him purporting to be *in his own right,* he having the legal estate, will be good; and although the deed to him contains a *proviso* that all conveyances by him in the disposition or the property shall *express the trusts* upon which the property is granted to him, and he omits in the conveyance by him to set forth such trusts—such provision being merely *directory,* and not a condition precedent, the omission to set forth the trusts does not at *law* affect the validity of the conveyance; and *it seems,* under the circumstances of this case, would be good even *in equity.*

It was not necessary, previous to 1801, in the certificate of the proof of a deed of land, that the officer granting the same should certify that he *knew* the subscribing witness, or that the witness *testified* that *he knew* the grantors to be the persons described in, and who executed the deed.

A conveyance of lands by a *trustee,* professing to convey the whole and absolute title, is a good foundation for an *adverse possession,* and it is immaterial for that purpose whether the trustee have the requisite authority to convey or not. A possession taken under such conveyance, claiming the title, and a continuance of such possession for 33 years, is as *adverse* to the grantor, and to *every other person claiming the same title,* as it is to all the rest of the world. A purchaser does not take his possession in subserviency to the title of his grantor; he holds for himself and adversely to his grantor.

A demandant in a *writ of right,* in like manner as a plaintiff in an action of ejectment, must recover on the strength of his own title, and cannot rely upon the defect of title in his adversary.

Where the legal estate is in a *trustee ;* and he conveys to a purchaser who enters under the title thus acquired, the *statute of limitations* commences to run in favor of the purchaser; and having commenced to run, its operation is not suspended by any disability under which a demandant in a writ of right was laboring when a right of entry subsequently accrued to such demandant.

The *limitation* as to *real actions* is subject to the same construction given to the provision of the statute in relation to *possessory actions,* i. e. that where the statute has once begun to run, a *subsequently accruing disability* will not impede or suspend it : *cumulative disabilities* are not allowed, either in a *real* or *possessory* action.

It seems that an *actual entry* and *perception of esplees* are not in all cases necessary to be proved to show an *actual seisin,* and that a *constructive seisin*

alone, resulting from the proof of a *legal title* without *actual seisin*, will entitle a party to maintain a writ of right.

Where the premises demanded in a *writ of right* are *wild* and *uncultivated land*, at the time when the right of entry of the demandant accrues, an action may be maintained *without actual entry.*

A new trial will be granted in a *writ of right*, as well as in any other action, where the verdict is against law or evidence.

WRIT OF RIGHT.  This was a *writ of right* prosecuted by the demandant for the recovery of an equal undivided fourth part of certain premises, part of lot No. 32, in the *Springfield patent*, situate in the county of Otsego, tried at the circuit in that county, in March, 1832, before the Hon. ROBERT MO-NELL, one of the circuit judges.

The demandant gave in evidence the following documents:

*First.* Letters patent to John Groesbeck and others, bearing date November, 4, 1741, granting a certain tract of land called the *Springfield patent*, reserving quit-rents.

*Second.* A warrant from the then chief justice of the colony of New-York, bearing date May 7th, 1772, directed to the sheriff of the county of Albany, commanding him to sell the Springfield patent for arrears of quit-rent.

*Third.* The return of the sheriff, that on the 7th day of July, 1772, he sold the whole tract to Philip Schuyler.

*Fourth.* A deed from the sheriff to Schuyler in pursuance of such sale, conveying the Springfield patent and bearing date 22d July, 1772.

*Fifth.* A *deed of partition* between Schuyler and six other persons, bearing date 27th November, 1786, dividing between themselves the Springfield patent, and by which, among other lots, lot number *thirty-two* is assigned to Philip Schuyler.

*Sixth.* A *bill in chancery*, filed by Charles John Evans and Agatha his wife, against Philip Schuyler, on the 3d May, 1788, and the *answer* of Schuyler thereto, filed on the 3d March, 1789, in which answer Schuyler admits that *general John Bradstreet* was interested with him and others in the purchase of the Springfield patent; that he advanced a portion of the funds required upon such purchase, though he wished not to be known in the transaction for fear of giving

offence to the then *Duke of Grafton*, who, or some of whose family, it was supposed had an interest in some of the lands which at the time were purchased by Schuyler at sales for quit-rents. He further admitted that the interest of *General Bradstreet* was covered under his (Schuyler's) name.

*Seventh.* The last will and testament of *General John Bradstreet*, bearing date 23rd September, 1774, by which, after certain specific devises and bequests, he makes the following devise : " All the rest of my estate, real and personal, I devise and bequeath to my two daughters, equally to be divided between them as tenants in common *in fee ;* but I charge the same with the payment of £100 sterling per annum to their mother during her life. *Notwithstanding the former devise* for the benefit of my wife and daughters, I empower my executors to do all acts and execute all instruments which they may consider requisite to the partition of my landed estate, and I devise the same to them as joint tenants, to be by them sold at such time and in such manner as they shall think most for the interest of my daughters, to whom the nett produce shall be paid, in equal shares ; the sum of £100 sterling per annum, being first deducted, or a capital to secure the same set apart, for an annuity to my wife as aforesaid. " By this will Gen. (then Colonel) Philip Schuyler and William Smith, Esq. were appointed executors. The testator died two days after the making of the will. Mr. Smith declined to act, but General Schuyler proved the will, and took out letters testamentary on the 30th September, 1774. The two daughters of the testator named in the will were *Martha Bradstreet* and *Agatha Du Bellamy*, then the wife of Charles Du Bellamy, but subsequently the wife of *Charles John Evans*, the complainant in the bill of chancery filed against Schuyler.

*Eighth.* The last will and testament of *Martha Bradstreet,* bearing date 15th May, 1781, whereby the testatrix gave the produce and interest of her estate, real and personal, to her mother, Mary Bradstreet, during life—and after her decease, devised her real estate as follows ; *one third* to her sister Elizabeth Livius (who it seems was a step-sister of the testatrix) and to her heirs and assigns forever ; *one other third* to Samuel Bradstreet and Martha Bradstreet, children of her late

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

brother Samuel Bradstreet, deceased, in fee ; and *the remaining third* to her sister *Agatha*, the wife of Charles Du Bellamy, in fee. By this will *Sir Charles Gould* was appointed sole executor, and was authorized to sell and dispose of such real estate as the testatrix was entitled to in North America or elsewhere, and to execute conveyances for the same, and to place out her monies upon such securities as he should deem proper, and in such manner and form, as to the shares of her sister *Agatha* and her nephew *Samuel* and niece *Martha*, as should be conformable to the provisions of her will, (referring probably to the provisions made in case of the decease of either of the devisees without issue.) This will was proved at London 30th March, 1782, and letters testamentary granted thereon to the executor, but it did not appear to have been proved in this state. The tenant, i. e. the defendant in this suit, objected to its admission in evidence, but the objection was overruled.

*Ninth.* The last will and testament of *Elizabeth Livius*, of Lincoln's Inn Fields, bearing date 20th November, 1794, whereby the testatrix appointed *Martha. Bradstreet*, daughter of her late brother Samuel Bradstreet, to be her sole heir to whatever estate real or personal she might die possessed of to be paid or delivered to her at the age of 21 years or day of marriage, whichever might first happen, provided she married with the consent of her friend *Sir Charles Morgan ;* and in case she died before she attained 21 years of age, " or before she be married as aforesaid, " then the testatrix appointed the brother, of Martha, viz. Samuel Bradstreet, to be her heir in the place and stead of Martha. Sir Charles Morgan was appointed executor of this will. The will had not been proved either in England or in this state, but it had been deposited at the proper office in England, and liberty had been given to the demandant to take it from the files of that office. The demandant offered it in evidence as an *ancient deed*, producing at the same time a deed of lands in Cosby's manor, in the county of Oneida, executed under and by virtue of the will. The tenant objected to the evidence, but the objection was overruled and the will was read to the jury.

*Tenth.* A deed from General Philip Schuyler to *Agatha Evans* and *Edward Gould*, bearing date 16th May, 1794. In this deed the parties were described thus : " Philip Schuyler, of the county of Albany, in the state of New-York, Esquire, executor of the last will and testament of John Bradstreet, deceased and hereinafter mentioned, *of the one part*, and *Agatha Evans* of the city of New-York, in the said state of New-York, widow, one of the daughters of the said John Bradstreet, deceased, and *Edward Gould*, of the same place, merchant, *attorney to Sir Charles Gould*, knight, the only executor of the last will and testament of Martha Bradstreet, deceased, the other daughter of the said John Bradstreet, *of the other part*." After a description of the parties, followed these recitals : 1. A recital of the last will and testament of *General John Bradstreet*, setting forth the devise to his daughters, &c. 2. That at the time of the making of the will, and from thence until the decease of Gen. Bradstreet, he, the grantor, was seized in fee of 41 lots of land in the Springfield patent, enumerating them, and amongst the number including *lot number thirty-two*, and declaring that as to *one equal undivided sixth part* of such lots he was *seized in trust for Gen. Bradstreet*. 3. That William Smith had departed this life, and he, the grantor, had become the sole surviving executor of the last will and testament of Gen. Bradstreet. 4. That *Agatha Evans* is one of the daughters of Gen. Bradstreet. 5. That *Martha Bradstreet*, the other daughter of Gen. Bradstreet, did, on or about the 15th of May, 1781, make and publish her last will and testament, (setting forth the devises and other provisions therein contained,) and in and by the same constituted Sir Charles Gould her sole executor, with power to sell her real estate— and also reciting that Mary, the mother of the testatrix, had since the making of the will died. 6. That partition had been made of the several tracts of land sold for arrears of quit-rents and purchased by Schuyler, and that upon such partition, certain lots in the Springfield patent, which are enumerated, and among them lot No. 32, fell to the share of *Philip Schuyler as trustee for Gen. Bradstreet*, and were duly conveyed to him (Schuyler) in severalty, with other lots in the same tract which fell to him in his own right by indenture, bearing

date 27th November, 1786. It is then stated in the deed, that the grantor, *as well to invest the said Agatha Evans with a legal title to her proportion* of her said lands and tenements, devised to her by virtue of the wills of the said *John Bradstreet* and *Martha Bradstreet*, as to convey the rest and residue thereof to the said *Edward Gould, in trust for the several persons who may be entitled to the benefit thereof* under the will of the said Martha Bradstreet, and also for and in consideration of the sum of ten shillings current money, &c.; and *by virtue also of the powers and authority with which he is so as aforesaid invested,* and of all other powers which he may lawfully claim or exercise, hath granted, &c, and thereby doth grant, &c. unto Agatha Evans and Edward Gould, and to their heirs and assigns forever, all those several lots, &c. describing them, and amongst others enumerating lot No. 32, in the Springfield patent, described as containing 406 acres of land. *Habendum* as follows: two equal undivided third parts unto Agatha Evans *in fee,* and the remaining undivided third part unto Edward Gould, *upon trust* to sell the same and every part and parcel thereof, from time to time, as may be most expedient; and after deducting the charges of sale and other contingent expenses attending the said trust, to divide the residue of the money to arise from such sale to and among the said devisees, Samuel Bradstreet, and Martha Bradstreet, and the said Elizabeth Livius, and their heirs, executors and administrators, according to their several interests in the estate of the said Martha Bradstreet by virtue of her will, or to such persons as would be entitled thereto upon the happening of any of the said contingencies in the said will mentioned, affecting in any wise their proportion of the said estate, and *provided also that the same shall express and contain the trusts herein before mentioned as to the one equal undivided third part of the premises and every part thereof.*

*Eleventh.* A *decree* of the court of chancery of this state, made the 17th May, 1803, in a cause between Matthew Codd and Martha his wife, complainants, and Edward Gould and Samuel Bradstreet, defendants, by which it was adjudged that Edward Gould do transfer to Matthew Codd *all the personal estate* in his hands or possession *as trustee of Elizabeth*

*Livius*, deceased, and that he do transfer and convey to Martha Codd *all the real estate* vested in him as trustee as aforesaid. The decree then proceeds as follows : " But that nothing herein contained shall make the said Edward Gould personally responsible for any of the said trust property which may have been converted into money, and for which he would have been liable if he had not become a bankrupt and obtained a certificate of discharge, and that each party pay his own costs. And it is further ordered and decreed, that it be referred to one of the masters of this court, to take an account of the real and personal property in the possession of the defendant Edward Gould, as a trustee as aforesaid, not converted into money before his bankruptcy, and to direct a proper transfer and conveyance to the complainants as aforesaid."

*Twelfth.* A deed from Edward Gould to Martha Codd, late Martha Bradstreet, wife of Matthew Codd, bearing date 22d October, 1804, *reciting*, 1. The conveyance from Philip Schuyler to Agatha Evans and Edward Gould, of the date of 16th May, 1794, and setting forth the contents thereof; 2. That since the execution of such conveyance, the said Martha Codd had, by virtue of the last will and testament of *Elizabeth Livius,* become entitled to all the estate of the said Elizabeth Livius *in the premises referred to in the deed from Schuyler and conveyed to Gould in trust, not sold or converted into money according to the said trust;* 3 That Edward Gould had lately become a bankrupt, and had been duly, according to the act of congress, declared a bankrupt, and that a certificate of discharge had in due form of law been obtained by him ; 4. That on the 17th May, 1803, a decree had been made by the court of chancery, adjudging, &c. ( as above stated;) and 5 That he, Gould, is willing to convey to the said Martha Codd *such proportion* of the real estate mentioned in the indenture from Schuyler, as by virtue thereof she may be entitled to, under the will of Martha Bradstreet; and that he, Gould, is also willing to convey to the said Martha Codd all the real estate vested in him, as trustee for the said Martha Codd. It is then stated that the said Edward Gould, in consideration of the premises and in pusuance of the said order and decree of the court of chancery, and also in consideration of the sum of

one dollar, &c. hath granted, &c. and thereby doth grant, &c. unto the said Martha Codd *in fee,* all the real estate held by him at the time of his becoming a bankrupt as aforesaid, *as trustee as aforesaid for the said Elizabeth Livius,* by virtue of the indenture of release executed by the said Philip Schuyler as aforesaid, and the several wills therein referred to; *and also* all the real estate held by him, the said Edward Gould, at the time of his becoming a bankrupt as aforesaid, *as trustee for the said Martha Codd,* by virtue of the said indenture and wills last above referred to.

*Thirteenth.* A release from *Samuel Bradstreet* to Martha Codd, bearing date 1st November, 1799, of all right, title and interest which the releasor had or might have by survivorship under or by virtue of the will of *Martha Bradstreet,* made by her on the 15th May, 1781.

*Fourteenth.* A conveyance and release from *Samuel Bradstreet* to Martha Codd, bearing date 26th July, 1802, of all right, title and interest, which he had or might have under and by virtue of the will of *Elizabeth Livius,* made on the 20th November, 1794. In this deed it is alleged that Martha Codd intermarried with Matthew Codd before she attained the age of twenty-one.

*Fifteenth.* A certificate under the hand and seal of *Sir Charles Morgan,* formerly known as *Sir Charles Gould,* bearing date 4th June, 1800, stating that the marriage between Matthew Codd and Martha Bradstreet took place before he was apprised of any attachment between the parties; that immediately after the solemnization of the marriage, Mrs. Codd apprised him of the same, and presently, after hearing that Mr. Codd was a young gentleman of good character, he did not hesitate to give his free consent; that, had he been applied to before the marriage, from the information he has since had of Mr. Codd, he would not have refused his consent; and that he never has declared his dissent.

*Sixteenth.* A decree of the court of chancery, made on the 16th June, 1817, granting a *divorce, a vinculo matrimonii,* on a bill of complaint filed by Martha Codd, against her husband Matthew Codd, in which it is stated that the marriage between the parties was solemnized *in the year* 1799.

And *seventeenth*. The last will and testament of *Agatha Evans*, bearing date 9th November, 1794, whereby the testatrix, after bequeathing sundry legacies to divers persons, devises all the rest, residue and remainder of her estate, both real and personal, to Richard Harrison, Edward Gould and Charles Wilkes, *upon trust* that they shall convert into money all such parts of her estate as shall be of a saleable nature, by disposing of the same for the best prices that can be gotten for the same, and invest the proceeds in such stocks or funds as they shall think proper ; that they shall pay the legal interest of £2000 annually to one Sarah Hopper while she remained unmarried, and on the day of her marriage pay to her one half of the £2000, and the remaining half to *Samuel Bradstreet* and *Martha Bradstreet,* the children of her brother Samuel Bradstreet; and in case of the death of Sarah Hopper unmarried, to pay the whole of the £2000 to Samuel Bradstreet and Martha Bradstreet ; and then, after directing sundry other payments to other persons, the testatrix orders that, as to all the rest, residue and remainder of the said trust monies, stocks, funds and securities, the interest, dividends and profits shall be paid annually to *Frances Symington,* the wife of *James Symington,* during their joint lives ; to James Symington if he survives his wife, and to the wife if she survives her husband; and after the death of both, to such persons as *Frances Symington* shall, by her last will and testament, appoint. The power of sale to the executors is however made, subject to the consent of James Symington and Frances Symington, by a *proviso* in the will in these words : " But the consent of the said James and Frances Symington during their joint lives, and the consent of the survivor of them, in case of the death of either, shall be necessary to every such sale and disposal of my said real estate." This will also contains the following clause : " And whereas, my late husband and myself have joined with certain other persons claiming under *General Bradstreet,* in certain conveyances of lands to persons who purchased of us and the other claimants, which conveyances, it is supposed, did not vest *the fee* of the land in those purchasers—now therefore, I authorize and empower my executors hereinafter named to execute to

those purchasers respectively, good and sufficient deeds, conveying to and vesting in them the fee simple of all my part of the said land sold to them as aforesaid, which deeds and conveyances I hereby declare shall be good and efficient in law."

On the trial of this cause, the *tenant* opened the case to the grand assize, and called a witness, who proved that as long since as 1788, lot No. 32 was occupied by one Peter Millington, and by Robert Riddel, Hugh Riddel and Thomas Riddel, who held under him; that the persons in possession claimed to hold the lot under a contract obtained from one *Evans* and one *Gould* for the sale of the whole lot. At that time improvements to a considerable extent had been made, and there were two log houses and log barns upon the lot. The same witness stated that he understood that the occupants of the lot were called on by *Evans* and *Gould* to pay what they owed for the lot, and that the occupants procured *William Cooper* to purchase the lot and take the title to himself; that Cooper accordingly procured the title, and the occupants continued upon the lot under him; that Hugh Riddel, one of the occupants, sold the part possessed by him to Alexander M'Collum, who subsequently sold to the *tenant* in this writ of right, and that Cooper turned Millington out of possession, and sold the part of the lot occupied by him to William Gilchrist, who also subsequently conveyed to the tenant.

The tenant then gave the following documents in evidence: *First.* A deed from *Edward Gould, in his own right,* and *Edward Gould, Richard Harrison* and *Charles Wilkies,* executors of the last will and testament of Agatha Evans, to *William Cooper,* bearing date 11th June, 1796, whereby the grantors, for the consideration of £240 17s. 1d., conveyed to the grantee the whole of lot No. 32. This deed purported, as appeared by a certificate endorsed thereon, to have been proved on the day of its date before *James Kent,* then one of the masters in chancery of this state. The master stated in his certificate that Pierre G. Flemming, one of the subscribing witnesses to the deed, came before him, who being sworn deposed and said that he saw Charles Wilkes, Richard Harrison, Edward Gould, both for himself and as executors therein

mentioned, severally execute the deed for the uses therein mentioned, and that Alexander Kirkpatrick, with himself, subscribed their names as witnesses thereto ; wherefore the master allowed it to be recorded, and it was accordingly recorded. The *certificate* was objected to as insufficient by the counsel for the demandant, but the objection was overruled.

*Second.* A deed from *William Cooper* to *Robert Riddel,* bearing date 26th August, 1796, conveying to the grantor, with warranty, all that part of lot No. 32, lying *east* of a creek running through the lot, for the consideration of the sum of £479 12s. 4d.

*Third.* A deed from *Robert Riddel* to *Hugh Riddel* of part of the premises conveyed to the grantor by Cooper. Date of this deed 29th October, 1796. Consideration £121 17s. 6d.

*Fourth.* Another deed from *Robert Riddel* to *Hugh Riddel* of another part of the same premises. Date of this deed 4th May, 1800.

*Fifth.* A deed from *Hugh Riddel* to *Alexander M'Collum* for the same premises conveyed to the grantor by *Robert Riddel.* Date of deed 11th of January, 1808. Consideration $1000.

*Sixth.* A deed from *Alexander M'Collum* to *David M'Collum* of the same premises, conveyed to the grantor by Hugh Riddel. Date of deed 25th of April, 1817. Consideration $1000.

*Seventh.* A deed of the same premises from *David M'Collum* to *George Clarke,* (the tenant in this suit.) Date of deed 1st April 1825. Consideration $2000. Besides the above conveyances, the tenant showed title derived by sundry mesne conveyances from Robert Riddel, to 25 perches of land on the *east* side of the creek, not included in his deed from David M'Collum.

*Eighth.* The tenant, to show title in himself to that part of lot No. 32 lying *west* of the creek, read in evidence the last will and testament of *William Cooper*, bearing date 13th May, 1808, whereby the testator devised specific portions of his estate to five sons and a daughter, and directed a partition to be made among them of certain other lands, and of bonds and mortgages taken by him on the sale of lands ; he also ap-

pointed his sons, *Richard Fenimore Cooper* and *Isaac Cooper*, executors of his last will and testament, and declared that if either of them should die, the next oldest son should supply the place of the one dying.

*Ninth.* A deed from Isaac Cooper, *surviving executor* of the last will and testament of William Cooper, to *William Gilchrist*, bearing date 3d May, 1817, and conveying, for the consideration of $2597, all of lot No. 32 lying *west* of the creek, except 8 acres. The tenant proved that *Gilchrist* had a contract for the sale of the premises conveyed to him, executed by *William Cooper* in his lifetime, the purchase money in which was principally paid up at the time of the execution of the deed to him; and that on receiving the deed, he surrendered the contract. There is no *express power to sell* given to the executors of William Cooper in and by his will; but there is a clause in these words: " Should any of the redemption leases be paid of to me, or exchanged by me or my executors before the day of division, then such legatee shall be allowed for the same in other property of equal value. " The time for the division or partition of the property appointed by the will was 1st January, 1815, and the evidence as to the *surrender of a contract* by Gilchrist was probably given in reference to the above clause in the will of William Cooper.

*Tenth.* A deed of the last mentioned premises from *William Gilchrist* to *George Clarke*, the tenant in this suit, bearing date 3d May, 1817. Consideration $6600. Which deed contains covenants of seisin and for quiet enjoyment.

*Eleventh.* A deed from the *devisees and the representatives of the devisees of William Cooper* to *George Clarke*, bearing date 16th November, 1818, conveying the *eight acres* reserved in the deed of Isaac Cooper. The consideration specified in this deed is $125 ; and the *tenant* then proved that all the lands possessed by him in lot No. 32 were covered by the conveyances thus by him produced.

The writ of right in this case was tested in October term, 1829. The demandant counted in January term, 1830, for the one *equal undivided fourth part* of 500 acres of land, &c. alleging *seisin* in herself, within 25 years, exclusive of the time during which she was within the age of 21 years, or covert, by *taking the esplees thereof*, &c. The issue was

joined in July, 1830. After the testimony was all submitted, the counsel for the tenant insisted, 1 .That the demandant had not shown legal title in herself. 2. That when the adverse possession relied upon by the tenant commenced, the legal title to the premises in question was either in Philip Schuyler *or* Edward Gould, and the statute having begun to run, the disabilities of the demandant could not stop it. Besides, her disabilities having ceased in 1817, she ought to have sued out a writ in 1827, instead of waiting until 1829. 3. To entitle the demandant to recover, she must show a seisin in fact, and a taking of esplees, which she has not done. 4. The title of the demandant, if any, is that of a *devisee*, and on that title a writ of right cannot be sustained. 5. In 1794, the premises in question were held by Philip Schuyler *or* Edward Gould; and it not being shown that either of them were british subjects, the *ninth article of Jay's* treaty of 1794 does not help the alienage of the demandant, admitting her to be an alien. 6. Every article of the treaty of 1794, not made perpetual by its terms, was abrogated by the war of 1812 between this country and Great Britain ; the *ninth article* of that treaty was not by its terms perpetual, and consequently the demandant being an alien, is unable to bring a real action. And 7. From the circumstances of the case, the grand assize would be warranted in presuming a conveyance from the demandant. The grand assize found a verdict for the demandant. The tenant moves for a new trial.

*J. O. Morse*, for the tenant. 1. The demandant has shown no *actual* seisin of the premises by taking the esplees or profits. She counts on her own seisin by the taking of the esplees, and is bound to prove this averment in her count. A *constructive* seisin will not sustain it. An *actual* seisin, or what is tantamount to it, must be made out. Jacob's Law Dict. tit. Esplees, 1. H. Black. R. 1. 5 Taunton, 326. Co. Litt. 292 (*a*). 19 Viner, 313, *n*. 2, Bevill's case, 4 Reports, 9. 2 Sch. & Lef. 104, 624. 2 Saund. 45. 7 Wendell, 250. The supreme court of the United States have not, as has been supposed, relaxed this rule.

2. The demandant has shown no legal seisin or title to the premises. In the case of this same demandant against Huntington, 5 Peters' R. 402, Mr. J. Johnson, in delivering the opinion of the court, says, " at no time had the plaintiff's lessor (the present demandant ) a *scintilla* of right known to the common law till she received the deed of 1804." The only difference in the facts between the case of *Bradstreet* v. *Huntington* and the present case is, that in the former Gould conveyed to Potter, under whom the tenant held, *before* the deed from Schuyler *to* Gould ; and in the latter he conveyed *after* he obtained the deed from Schuyler. The deed from Gould to potter is dated December 24th, 1790, and that from Gould to Cooper, under which the tenant in this case claims, is dated June 11th, 1796. It will thus be seen that there is no essential difference in the two cases. The demandant, therefore, had no title to any land until her deed from Gould in 1804 ; and that deed did not vest in her the title to the premises in question, for Gould, her grantor, had *eight years before* conveyed them to William Cooper. The authority of the case of *Bradstreet* v. *Huntington* cannot be questioned, for it professes to be, and is founded on the decisions of the courts in our own state. We might therefore repose ourselves on the decision in that case alone. The legal estate was in Schuyler and if he held it in trust, it was a trust not executed by the statute ; and any presumption of a release from the trustee *to* the *cestui que trust* is repelled, by the fact that Gen. Bradstreet requested Gen. Schuyler to take the legal estate and keep it secret, to avoid giving offence to the Duke of Grafton. But admitting that the legal estate was once in Gen. Bradstreet, it passed by his will to Schuyler. By it Schuyler had power to sell. The words of the will are, " I devise the same (the lands) to them (his executors) as joint tenants, to be by them sold, &c." Schuyler survived the other executor, W. Smith. " When lands are devised to trustees in trust to sell, to raise money, to pay debts, or for any other purpose, and subject thereto, in trust for a third person, the trustees will take the legal estate ; for otherwise it would not be in their power to execute the trust." 1 Cruise, 467, tit. XII. Trust, ch. 1, sect. 24, 25. 1 Vesey 142. The legal estate was

therefore vested in General Schuyler; and being vested in him, Sir Charles Gould (afterwards called Sir Charles Morgan) had, as executor of the will of Martha Bradstreet, the elder, no land to sell, but could only receive the money from Schuyler when he sold it, which he might do by attorney, for it could not have been intended that he should come in person to receive it. The legal estate being in Schuyler, and Sir Charles Gould having authorized Edward Gould to receive the trust funds, Schuyler's conveyance to him, by which he conveys to him in trust "to sell from time to time," vested the legal estate in Edward Gould, by the rule before cited from *Cruise*. The conveyance from Schuyler to E. Gould having vested the title in the latter, it, as it respects the premises in question, passed to William Cooper, by Gould's deed to him of July 11th, 1796. It is therefore gone from the demandant.

It will be contended by the demandant that the deed from Schuyler to Edward Gould was void, for the reason that the conveyance to Gould was not a good execution of the trust. This cannot be so; but let it be admitted, and what is the consequence? The legal estate is now in the heirs of Schuyler, and equity will compel them to execute the trust, or will appoint a new trustee. If, then, we make the admission the demandant is not helped by it.

The demandant is estopped from denying that the legal title was in Schuyler, or that it did not pass to Edward Gould. The deed from Gould to the defendant, as well as the releases from Samuel Bradstreet to her, recognize the title to have been in Schuyler, and also recognize the appointment of Edward Gould as attorney for Sir Charles Gould, and affirm the conveyance from Schuyler to Edward Gould. By accepting of this conveyance and these releases, the demandant admits the recitals in them to be true. *Carver* v. *Jackson*, 4 Peters' R. 83 to 89. She also admits thereby the sales made by Gould to be valid, for she accepts of a conveyance of *what remains unsold*. She releases Gould from all claims on account of antecedent sales, and therefore, as we contend, affirms the sale to William Cooper in 1796, and releases all claims

for the money. Even if Edward Gould had sold without
authority, the acceptance of the conveyance, and the releases,
with the recitals in them, would have this effect. If A. sell
the land of B. without authority, and B. afterwards receive
the money from A. and give him a discharge from it, does not
B. thereby affirm the sale?

If it be said that the demandant cannot be estopped by the
recitals, for the reason that she was then a married woman,
we have two answers to give: 1. The conveyances were
made by direction of the court of chancery, which, in its de-
cree for the conveyances, considered itself as her guardian
and protector, and she must now be concluded by it; and 2.
On the trial of this cause, very long after her divorce, she in-
troduces these conveyances as part of her own evidence to
make out her case. In introducing these deeds, she cannot select
such portions as make in her favor, and reject such as operate
against her. By now seeking (since her coverture expired)
to found her title on them, she waives all objection to them on
account of her coverture at the time they were executed.

It will be contended by the demandant that, by the deed
from the sheriff of Albany to Schuyler, a *resulting trust* was
created, of which Gen. Bradstreet was the *cestui que trust*,
and that under the statute, Gen. Bradstreet took the legal es-
tate. Admit for a moment that it was so. The legal estate
passed back to Schuyler by the will of Bradstreet. It may
well be doubted, however, whether here was a resulting trust.
It was agreed between Bradstreet and Schuyler, that Schuyler
should hold the legal title and keep it, to avoid giving offence
to the English Duke. But can the *cestui que trust* of a result-
ing trust, without an actual entry, maintain a writ of right?
We do not however rely upon this, for if the resulting trust
be admitted, and it also be admitted that Gen. Bradstreet in
his lifetime had the legal estate, it passed to Gen. Schuyler
under the will of Bradstreet.

The conveyance from Edward Gould to the demandant in
1804 did not include or intend to include the premises in ques-
tion, which Edward Gould had conveyed to William Cooper
in 1796, in execution of his trust; but suppose it did, it would
be inoperative as to those premises, by reason of adverse pos-

session under the deed from Gould to Cooper, dated eight years before. Even if the deed from Gould to Cooper, was void, which we deny, still the possession under it was adverse, and rendered the deed from Gould to the demandant void. *Bradstreet* v. *Huntington*, 5 Peters' R. 438, before cited.

3. If it even be admitted, for the sake of the argument, that the demandant has shown a title as devisee, which the tenant denies, still, as she has not shown an actual entry as devisee, or what is equivalent to it, she cannot recover. A writ of right cannot be sustained by a devisee upon the seisin of the testator. *Williams* v. *Woodward*, 7 Wendell, 250, and cases there cited.

4. The legal estate being vested in Schuyler, and passing from him to Gould and from Gould to Cooper, it is clear that the demandant never had any actual seisin, as stated in her count. The first actual posesion of the premises in question was taken previous to 1788, under coutracts made with Evans and Gould, which Gen. Schuyler agreed to ratify. These contracts were followed by the deed to Cooper, with the consent of the occupants. The possession therefore has been a continued one, without the least interruption. When, we ask, therefore, has the demandant had an actual seisin, or what was equivalent to it?

5. The possession and ownership under Gould's contract and his conveyance to Cooper is adverse to the demandant, and a bar to a writ of right. 1. Since the decision of the case of *Le Frambois* v. *Jackson*, 8 Cowen, 589, it cannot be doubted but that our possession was adverse from 1788, a period of 45 years. 2. If there is any doubt of this, there can be none of its being adverse from 1796, the date of the deed from Gould to Cooper. The demandant, as she says, (but there is no legal proof of it in the case,) was married in 1799, became of age in 1801, was divorced in 1817. This suit was commenced in 1829. Now, if we admit that the demandant was married and came of age at the times she states, still she is barred. When the adverse possession commenced, she was laboring under the dissability of infancy only. She cannot connect her disabilities. She did not therefore bring her action soon enough. Disabilities are not cumulative. 18 Johns. R.

40. 3 Johns. Ch. R. 129, 138. 4 Taunt. 826. 6 East, 801. 4 Day, 298. Plowden, 353. 4 Mass. R. 182. 5 Cowen, 101. It will however be contended for the demandant that owing to a supposed difference in the provisions of the second and third sections of the statute of limitations, R. L. of 1813, vol. 1, p. 185, disabilities in real actions are cumulative. This question, it is true, has never been expressly decided; but it has been often held in the English courts, that the statutes of limitations are to receive a uniform construction. 4 T. R. 310· The statutes of limitations are statute of repose, and public tranquility is to be kept in view in their construction. We suppose that the only difference between the second and third sections is, that real actions are placed on a better footing by five years than mixed actions. A contrary construction might in some cases postpone the assertion of claims for near a century and a half, within, which time large cities have been built, both in Europe and in this country. It has been shown that the legal estate was in Gen. Schuyler after the will of Gen. Bradstreet. The statute therefore began to run against Gen. Schuyler, and having once begun to run, the disabilities of the demandant (even admitting that she afterwards had the legal estate) could not stop it. Ballantine, 62, 63. 4 T. R. 306, 307. 15 Johns. R. 169. 13 id. 513. 1 Wheaton, 292, 296, per Marshall, C. J.

The demandant's own evidence shows that she never was seized of any lands until the decree, and the conveyance from Gould to her in 1804. This decree and conveyance show, that until that time the whole legal estate was vested in Gould, with full power to sell for the execution of the trust, and all the lots he had sold were excepted from the decree and conveyance.

7. All the material points arising in this cause on the part of the demandant have been decided against her by the supreme court of the United States, in her case against Huntington, 5 Peters' R. 430, before cited.

8. The demandant must recover on the strength of her own seisin and title, and not on any supposed defects in the tenant's seisin and title. This rule is inflexible. She must also recover on her own legal title, and can derive no support either from

any equitable title she may have, or from the weakness of the title of her adversary. 2 Starkie's Ev. 514, 515. 2 T. R. 684. It is not therefore necessary to inquire whether, by the will of William Cooper, his executors had power to sell land or to examine the other objections that may be urged to other links in our chain of title. We show an uninterrupted and exclusive possession under the deed from Gould to William Cooper to the present time. 9 Johns. R. 174, 180. The possession was taken in good faith, and the demandant ought not to be permitted now to say that we have not got all the title that was vested in Cooper by his deed from Gould. The exclusiveness of our title and possession repels all presumption of our being a tenant in common with the demandant. *Bogardus* v. *Trinity Church*, decided by Ch. Walworth.

If, then, we have succeeded in shewing that the demandant never had a seisin in fact, or what was equivalent to it ; or that she has no legal title ; or, if she had, that she is barred by the statute of limitations; it follows that the verdict is wrong, and that it must be set aside.

*I. L. Tillinghast & D. D. Barnard,* for the complainant, insisted : *first,* that the *tenant* had not shown a valid paper title to the premises in question. The deed of the 11th June, 1796, from Edward Gould in his own right, and from Edward Gould, Richard Harrison, and Charles Wilkes, executors of the last will and testament of Agatha Evans to William Cooper, was inoperative to convey a fee. As a deed of the *executors* of Mrs. Evans, it was inoperative, because her executors had no power in *themselves* to convey ; their power depended on the *consent* of *James Symington* and *Frances Symington,* who for this purpose, were by the will the sole *donors* of the power, and they never gave it. 1 Chance on Powers, 264, et seq. § 725, 727, 732. id. 172, § 454. 8 Cowen, 583. 5 Wheaton, 337. 1 Wash. Cir. C. R. 330. 6 Maule & Selw. 324. 3 East, 440. 1 Starkie's Ev. 333. 3 id. 1199. 8 Wheaton, 535. 2 Paige, 202. Sugden on Powers, 212, 263, 264, 266. As the deed of Edward Gould admitted he had a trust estate under the deed of Gen. Schuyler of the 16th May, 1794, it was inoperative to convey a fee, because he conveyed only

what he held *in his own right*, and could not pass the *trust estate*, even were it competent to him to do so by a suitable conveyance. 1 Johns. Ch. R. 574. 21 Com. Law R. 116, 133. 8 Cowen, 543, 583. 3 Littell's R. 410. 5 Peters' R. 350. 2 Bibb's R. 276. Gould had nothing *in his own right* in the premises in question except the *life estate* of Gen. Schuyler and he therefore could not convey a *fee ;* and whatever interest he did convey terminated by the death of Gen. Schuyler, on the 18th November, 1804, when Gen. Schuyler died. 1 Chance on Powers, 33, § 88 ; 261, § 717, 18, 19. 21 Com. L. R. 116. 2 Cowen, 195. And if the deed of Gould would have passed a *trust estate*, yet it did not in this case, as the trust is *not set forth* in the deed, and the power was given on that *express condition*. 3 Littell's R. 410. So also the deed from *Isaac Cooper*, as executor of William Cooper's will to *Gilchrist*, was inoperative, because by William Cooper's will *one executor* had no power to act ; if one of the executors died, another son was to take his place as executor. 4 Johns. Ch. R. 369. 5 Binney, 481. 2 Bibb, 270. 4 Taunt. 225. 7 id. 361. 21 Com. Law R. 133. 2 T. R. 241, 380, 781. The power to sell if given at all, expired before the deed was given. 1 Caines' Cas. in Error, 15. 4 Wendell, 482. 8 id. 681. But there was no power of sale given to the executors ; it seems the testator intended to have given such power, but he omitted to use the necessary words to carry his intention into effect. 6 Har. & Johns. R. 208. 2 Dessaus. R. 250, 251, n. 8 Cowen, 228. 3 T. R. 86. 4 id. 709. 5 Cowen, 228.

*Secondly.* They insisted that the demandant had shown a good paper title in one of two ways ; either. 1. by way of *resulting trust* in Gen. Bradstreet, or, 2. by a *direct trust* through Gen. Schuyler and Edward Gould. By the deed from the sheriff of Albany to Gen. Schuyler, of the lands purchased by him at the sale for quit-rents, the title to the Springfield patent was vested in Gen. Schuyler, and under this deed a *trust resulted* to Gen. Bradstreet for one equal undivided sixth part of the tract. The trust is fully proved by the answer of Gen. Schuyler to the bill in chancery, filed by Evans and wife, in right of Mrs. Evans, as one of the daughters and devisees of General Bradstreet. 2 Vesey & Beame's R. 388. 2 Johns.

Ch. R. 410, 411. 3 Wendell, 643, 648. 1 id. 625. 6 Cowen's R. 706. 4 Dessaus. Ch. R. 487. 2 Vernon's R. 106, 107. 11 Johns. R. 91. 3 id. 216. 16 id. 199. 1 Johns. Cas. 156. 1 Johns. Ch. R. 582. 3 Binney's R. 305. 2 Serg. & Rawle's R. 526. 1 Dallas' R. 193. 1 Cowen's R. 712. 6 Cranch's R. 25. 7 id. 92. 2 Wheat. R. 382, 383. 4 id. 220, 221. 21 Com. Law R. 87, 88. 1 Starkie on Ev. 53, 54, part 1, § 33. 3 id. 1300, 1301, part 4. 6 Peters' R. 620, 621, 631, 632. 16 East's R. 334. 9 Wendell, 209. The operation of this trust was, to give to the *cestui que trust* the legal seisin, possession, and estate, in one undivided sixth part of the lands conveyed to Schuyler, as effectually as though he had himself been named as grantee, because such a trust is within the letter and the intent of the statute of uses. See Statute of Uses, 1 R. L. of 1813, pages 72, 73, 74. 1 Preston on Abstracts of Title, 307, 308. The uniform practice in England and in this country of holding such a trust liable to sale on execution against the *cestui que trust*, is a construction of the statute of uses to this effect, inasmuch as such liability could only exist, if the estate were a legal estate. See 16 Johns. R. 199. 1 Johns. Ch. R. 52. 3 Wendell, 651. 4 id. 465, 495. 3 Johns. R. 216. 1 Johns. Cas. 155, 156. 3 Wendell, 573. 7 id. 379. Our courts have repeatedly held that such a trust is executed by the statute of uses. 2 Paige's Ch. Rep. 238. 2 Wendell, 134. 4 id. 797. 1 Yates' R. 166. 10 Johns. R. 456, 457.

General Bradstreet gave all the residue of his estate by way of executory devise in fee to his two daughters Agatha and Martha, as tenants in common; to take full effect whenever the execution of a power of sale given to the executors should become impossible, either by the death of the executors without selling, or by any other equally effectual event; or else he gave his two daughters a vested estate in fee, and then carved out a life estate for his executors, and gave them a discretionary power of sale; from which it results as a necessary consequence, that although the estate would vest immediately in the daughters, in the nature of a remainder, yet they would not have a right of entry or possession until the

termination of the particular estate, viz. the life estate of the executors, without having sold the estate.

The devise to the executors did not revoke, nor was it intended to revoke the devise to the daugters. 2 Paige's Ch. R. 130, 129, 131. 1 Yeates' R. 45, 319. 6 Peters' R. 75. 10 Wheaton's R. 227. 8 Cowen's R. 56, 284, 285. 21 Com. Law Rep. 332, 350. 22 id. 142. 2 Dowling & Ryland's Rep. 36, 37. 6 Harris & Johns. Rep. 208, to 211. 2 Wendell, 34. 5 East's Rep. 171, 172. 1 Smith's R. 387, 388. The whole object of the devise to the executors was capable of being carried into perfect effect, without the destruction of the estate devised to the daughters. 1 Yeates' R. 342, 437, 518. 8 Cowen's R. 284, 285. 1 Wendell, 669. 4 id. 672. 6 Peters' R. 77, 78. 3 id. 117, 118. The intention was that the daughters should take the property by devise, in case the executor should not sell according to the power. 3 Wilson's R. 142. 1 id. 140. 2 id. 323. 7 Cowen's R. 194. 3 Atkyn's R. 390. 1 Ventris' R. 214. 3 Yeates' R. 187. 1 id. 437. 2 id. 54, 302. 10 Wheaton's R. 227. 3 T. R. 345. 6 Peters' R. 78. 3 id. 117. 3 Rawle, 489. 1 Roberts on wills, 265. 1 Preston on Abstracts of Title, 111, 112. By the will only a *life estate* was given to the executors, to *them*, and the *survivor* of them ; nor was any other intended to be given. They did not take a fee by implication ; for that would be inconsistent with the manifest intention of testator, and entirely unnecessary for the exercise of the power entrusted to them by the will. 1 Roberts on Wills, 489 to 492, § 6. 1 M'Cord's Ch. R. 72, 73, 78, 86. 2 Preston on Estates, 68 to 71, 231, 232, 242. 1 Yates, 342, 518. 1 Har. & Gill, 111, 112, 125. 6 Har. & Johns. 209, 210, 211. 5 East, 162, 171. 1 Smith's R. 387, 388. 2 Wendell, 34. 1 id. 669. 8 Cowen, 284, 285. 10 Wheat. 227. 21 Com. Law R. 332, 350, 352, 354, 356. 2 Dowl. & Ryl. 489, 490, 492, 493. 1 Preston on Estates, 50, 53, 54, 56, 57, 58, 59, 62, 63, 65, 67, 79 to 81, 119, 120. If the daughters were *not* to take as devisees, then the consequence of what is contended for on the part of the tenant is, either 1. That the intention must have been that they should be disinherited. in case the executor should elect to take the whole property to

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

himself, by declining to sell in his lifetime ; and then the lands would go to *his heirs,* without even a trust for the daughters of Gen. Bradstreet ! Or else, 2. If the devise of the land to the testator's two daughters, in fee, is to be considered as re-voked by the devise of a life estate to the executors, then the devise to the two daughters *in fee* must be held to be altogeth-er expunged from the will; and then the only devise of the land contained in the will would be a devise for life to the ex-ecutors, with a power of sale, for the purpose of distributing the proceeds amongst the heirs; which would bring it com-pletely within the principle of the case of *Jackson ex dem. Miller* v. *Potter,* 4 Wendell, 672, where the real estate was expressly devised in fee, only to the executors and the survi-vor of them, with a power to sell the same, and distribute the proceeds amongst the heirs : yet this court held, that if the executors die without selling and conveying, the estate de-scends to the heirs at law, and a conveyance from them is good, to pass the estate. Instead of this, the will gave to Martha Bradstreet, one of the daughters of Gen. Bradstreet, either an interest, by way of executory devise, to become a fee *in futuro,* in the one equal undivided half part of the lands in which Gen. Bradstreet had a legal estate, under the deed to Schuyler, on the quit-rent sales, or a vested estate in fee, of which she was not to come into possession until the termina-tion of the life estate devised to the executors ; and which might be divested by a sale, pursuant to the power given to the executors, and under either view, this was a devisable in-terest, in Martha Bradstreet; (1 Roberts on Wills, 480, 481, note,) because, by our statute of wills, any estate of inheritance may be devised. An estate of inheritance will go to the heir, without reference to the fact whether the ancestor had or had not actual seisin, or right of entry. Vide Act concern-ing Wills, 1 R. L. of 1813, p. 364, § 1. 1 Peters, 570. 3 Marshall's Ky. R. 505, 508. 7 Cowen, 338. 2 Wendell, 166, 202. 3 Peters, 127, 128, 129. 3 id. 136, 174, 175, 176.

The will of Martha Bradstreet, one of the two daughters and devisees of Gen. Bradstreet, was properly received in evidence, because, the proof of the will in England (where the testatrix resided at the time of her death) showed the genuineness of

the will. 3 Johns. Cas. 287. 5 Cowen, 227, 228. 6 Peters, 631, 632. It was taken from the proper office, where it had been deposited, by a rule of the prerogative court, (being the court which was entitled to the custody of wills) granted on the prayer of the demandant, and upon her giving bonds for its safe return, for the express purpose of enabling her to produce it in evidence on the trial of suits which she had commenced, and was about to commence for the recovery of parcels of land in America, which she was entitled to under the will. 3 Johns. Cas. 286. 6 Cowen, 179, 180. 7 Wendell, 374, 375. This will is recited in the release from Samuel Bradstreet, one of the devisees, to the demandant. 4 Peters, 83, 84, 87, 88. 6 id. 620, 621, 630, 631, 632. 3 Starkie's Ev. 1300, 1301. 5 Cowen, 221. 7 East, 290. 10 id. 117 to 122. Matthews' Presum. Ev. 269. It was admissible also because the admissions of General Schuyler of the validity of this will, in his answer in chancery to the bill of Mrs. Evans and her husband, previous to his deed to Mrs. Evans and Edward Gould, and also the recital of this will in that deed, are conclusive against the parties to that deed, and all, including the tenant, claiming under or through that deed, and not by a paramount title. 16 East, 334, 337, 339, 340, 341. 6 Cranch, 24. 4 Peters, 83, 86, 87, 88. 6 id. 610, 611, 612, 622. 6 Cowen, 180. 1 id. 712. 3 Johns. Cas. 174. 7 Cranch, 192. And being upwards of thirty years old, might be read in evidence, without proof. 7 Wendell, 373, 374. Adams on Ejectment, 259, 260. 15 Com. Law R. 150. 2 Mann. & Ryl. 195. 4 T. R. 709, note. 3 Starkie's Ev. 1694. The effect of this will was to give, by way of executory devise, an undivided *twelfth* part of the land in the Springfield patent, belonging to the late Gen. Bradstreet, to the *demandant*, to vest in fee on her becoming twenty-one years of age; and also two twelfths to Elizabeth Livius, to be at her own disposal, by will or otherwise, independent of her husband, subject only to a power of sale given to the executor. 1 Vesey, sen., 156, 157, 185, 303. 3 Atkyns, 714. 3 Rand. R. 373, 392. 3 Johns. Ch. R. 523. The effect of the partition deed between General Schuyler and others, proprietors of the

Springfield patent, was not to transmit any title, but to divide the possession between those already entitled. General Schuyler took the separate possession in lot No 32, the premises in question in his own name, to hold under the purposes of General Bradstreet's will, and in such trust, and no other, as that will creates. 3 Johns. R. 333, 334. 4 id, 212. 15 id. 502. 4 Wendell, 284.

The will of Elizabeth Livius was sufficiently proved. The demandant had leave to take this will from the proper office of deposit in England, and where it could not have been found, unless it had first been regularly proven, and shown to have been genuine. 7 Wendell, 374, 375. 3 Johns. Ch. Cas. 286, 287. 5 Cowen, 227, 228. It is recited in the release from Samuel Bradstreet to the demandant. 4 Peters, 83, 84. 7 East, 290, 291. 10 id. 117, 119, 120, 121, 122. Matthews, Presump. Ev. 269, 270. 3 Starkie's Ev. 1300, 1301. 6 Peters, 620, 621, 630, 631. It was an ancient deed, and possession under it was sufficiently shown, together with other circumstances, to raise a sufficient presumption of its genuineness, even if it had not been accompanied with possession. 12 Com. Law R. 209, 212, 215. 3 John. Cas. 286, 287. 4 Wendell, 282. 4 Wheaton, 221. 5 Cowen, 226. 6 id. 179. 5 Johns. R.44. Matthews' Presump. Ev. 260, 161. 15 Com. Law. R. 150. 2 Mann. & Ryl. 197. 3 Starkie's Ev. 1694. Adams on Eject. 259. 7 Wendell, 374, 375. It is stated in the case that a possession under the will was proved to the satisfaction of the court at the trial, and the verdict of the grand assize having established the validity of the will, this court are bound to presume that the possession so proved was of a sufficient continuance and satisfactory character; especially as it was incumbent on the tenant, in making up the case, to state, for the information of this court, the precise evidence which was objected to. The gratuitous assumption that the circuit judge was wrong, is not to be made from the mere circumstance that the tenant's counsel said "I except to the decision." Matthews' Presump. Ev. 25. 3 Starkie's Ev. 250, 1251, part 4. 3 id. 1253. 3 Caines, 105. 2 Barn. & Ald. 388. 7 Com. Law R. 80, 81. 4 Wendell, 283. The effect of Mrs. Livius' will was to pass the property by way of the

execution of a power. The instrument which created the estate in Mrs. Livius, to wit, the will of Martha Bradstreet gave the power, and therefore Mrs. Livius, although a married woman, could pass the estate by her will. 11 Vesey, 221, 222. 3 Rand. R. 373, 3 Johns. Ch. R. 523. 1 Vesey, 46. 2 Dallas, 202, 203, 204. Sugden on Powers, 154 to 159. 2 Dessaus. Ch. R. 66. 1 Vesey, sen., 518, 156, 157. 1 Roper's Husband and Wife, 183, 183, 185. By this will Mrs. Livius gave, by way of executory devise, her two twelfths in the separate lot No. 32, to the demandant, to vest absolutely in fee, and of which she was to come into possession when she married with consent of Sir Charles Morgan, or when she became of age. 2 Preston on Estates, 259, 360. 3 Peter's, 115 to 118. If any doubt could arise as to the construction of that will, the release of Samuel Bradstreet, who was the only person entitled to claim under it except the demandant, is sufficient to settle the question in favor of the demandant. The demandant, then, had, when twenty-one, a legal and vested estate, in fee, under these wills, in three equal undivided twelfth parts, or one equal undivided fourth part of lot No. 33, provided Gen. Schuyler's deed to Mrs. Evans and Edward Gould did not divest and convey away the demandant's legal estate, and it did not, because Schuyler's power to sell was gone when Martha Bradstreet died. 3 Cowen, 651. 6 Johns. R. 73, 81. 8 Wheaton, 495, 536. 1 Binney, 546. The power of Schuyler was virtually renounced, and was at an end by the execution of the deed to Mrs. Evans, which professed to release to Mrs. Evans : thereby relinquishing one part of a power, which was in itself indivisible. 2 Cowen, 236, 237. 21 Viner's Abr. 514. 1 Rep. 173, 174, 112. 1 Chance on Powers, 261, § 717, 718, 719. If Schuyler had power to sell, this deed did not purport to be, and was not a sale of any part of the estate of the late Gen. Bradstreet, because, viewed as an attempt by Schuyler to substitute a trustee and executor in his place, it was absolutely void. Toller's Law of Executors, 20, 21. 2 Roberts on Wills, 42. Sugden on Powers, 175, ch. 4, § 1. 4 Johns. Ch. R. 368. 1 Williams' Executors, 123. 2 id. 617. 3 East, 410. 2 Vesey, sen. 643 2 Sch. & Lef. 330. 2 Atkyns, 88. The demandant then had

an estate in the premises, and on a seisin in her own right she brings suit. Such seisin is sufficient to enable her to maintain the suit. 13 Com. Law R. 115. 9 Dowl. & Ryl. 142. Co. Litt. 111, a. 3 Starkie's Ev. 1196, pt. 4. 1 Munf. R. 162, 160, 8 Cranch, 229, 250. 7 Wheaton, 28, 29, 30. 3 Rand. 570, 571. 1 Peters, 506, 507, 508. 8 Johns. R. 262. 14 id. 406. 15 id. 117. 5 Cowen, 102. 1 Johns. Cas. 125. 6 Serg, & Rawle, 21, 23. 2 Hayw. 11. 1 id. 180, 249. 2 Marshall, 19. 4 Cranch, 369. 4 Wash. C. C. R. 38.

*Secondly.* The demandant shows a good paper title through Gen. Schuyler and Edward Gould, on the supposition that Gen. Bradstreet's will was inoperative to transmit the legal title, on the pretext that the legal estate was at the time in Gen. Schuyler; yet Schuyler's deed to Mrs. Evans and Edward Gould recites the several wills of Gen. Bradstreet and Martha Bradstreet, and the deed is professedly given for the purpose of carrying those wills into effect. All persons, therefore, the tenant as well as others who claim under this deed, are estopped from claiming these lands, otherwise than as under this deed and the wills therein recited. 3 Wendell, 99 to 102. 1 Munford, 168, 6 Cowen, 180. 3 Johns. Cas. 176. 14 Johns. R. 225. 3 id. 334. 4 Wendell, 284. 20 Johns. R. 492. The effect of this deed, in the present view, was, to convey the legal estate to Edward Gould for the one equal undivided third part of lot No. 32, to hold, *not* in his own right, but as a trustee and executor in place both of Gen. Schuyler and of Sir Charles Gould, the executor of Martha Bradstreet's will; and to hold for the purposes of those wills, and with this additional restriction upon his powers, (if any powers of alienation *could* be given to him,) that any conveyances made by him of the trust estate should recite the trusts under which he held. But if Gen. Schuyler could not *substitute* Edward Gould as executor of Gen. Bradstreet's will in *his stead*, and *also* as executor of Martha Bradstreet's will instead of Sir Charles Gould; and if he could not convey a part of the estate, together with a correspondent portion of the power; then Edward Gould became, by force of that conveyance, the mere naked depositary of the legal estate, and unable to make any conveyance or alienation thereof in fee, unless by a release to

the *cestui que trust*, or in pursuance of a decree of some competent tribunal. 2 T. R. 241, 242. 21 Com. Law R. 116, 133. 5 Peters, 395. Sugd. on Powers, 175, 637, App. No. 1. Toller's Law of Executors, 41, 42. 2 Williams' Executors, 617. 1 id. 123. 4 Johns. Ch. R. 368. 2 Roberts on Wills, 42. 3 East, 410. 2 Ves. sen. 643. 2 Sch. & Lef. 330. 2 Atk. 88. 8 Wheaton, 535, 536. 1 Hammond, 232. 3 Littell, 410, 411. *1 Chance on Powers*, 255, 256, § 699, 700, 701. id. 261, § 717, 718, 719. 2 Dowl. & Ryl. 717. Although, if the will of Gen. Bradstreet gave Gen. Schuyler a life estate, such estate might pass by his deed to Edward Gould, and Gould might be competent to convey such life estate without prejudice to the fee. 2 Wendell, 363, 364, 365. id. 166, 203. 3 Johns. Cas. 104. 2 Dowl. & Ryl. 38, 40, 41. 8 Johns. R. 269. 10 Com. Law R. 295. 10 East, 583. 7 Pickering, 169. 10 Johns. R. 435. 16 id. 117. 20 id. 301. The effect of the deed therefore from Edward Gould to the demandant was, to convey to her the legal estate absolutely.

The demandant then shows a good title, provided Edward Gould's deed to William Cooper did not divest and convey away the estate; and it did not, because, if it be claimed that it conveyed to Cooper the trust estate, Cooper would then be privy in estate with the trust estate, and could take nothing under an instrument which did not, in any one particular comply with the conditions of the trust. 3 Littell, 410, 411. 8 Wendell, 681. 4 id. 482. 2 Dowl. & Ryl. 717. 2 T. R. 241, 252. 8 Cowen, 583. Sugden on Powers, ch. 4, § 1, p. 175. 6 Maule & Selw. 334. 3 East, 440. 8 Wheaton, 536. 11 Vesey, 220. But that deed did not convey and did not purport to convey the trust estate, but only what Edward Gould might have had in his own right, and if he had nothing, then nothing passed. 2 Wendell, 166, 203. id. 363, 364, 365. 1 Johns. Ch. R. 566, 574, 575. 10 Johns, R. 63, 65. If he had any thing in his own right, it could only be the life estate of Gen. Schuyler, and the continuance of that particular estate could not prejudice the estate in fee, because it was not adverse to, but consistent with, and derived under the same identical title. 3 Littell, 282, 283. 10 Com. Law R. 224, 225, 226. 3 Wendell, 339, 152, 153. 20 Johns. R.

306, 307. 16 id. 116. 10 id. 441. 2 Wendell, 357. Besides, as Cooper, at the time he took his deed from Edward Gould and others, became affected with notice of the trust and of the rights of the *cestuis que trust*, his purchase, if he attempted to obtain the trust estate, knowing that it would tend to defeat or impair the rights of the demandant, was a fraudulent act and void. 1 Johns. Ch. R. 581. 1 Dow's Parl. R. 66. 2 Mass. R. 506. 14 id. 296, 300. 10 Johns. R. 457. 15 id. 568, 569. 1 Burr. R. 474, 117. 1 Cruise's Dig. 541. 5 Day, 341, 345. 2 Ves. sen. 156. 3 Atkyns, 654. 2 Sch. & Lef. 146. Wendell, 227. Rob. on Fraud. Conv. ch. 5, § 1, p. 520, 589, 596, 597. 9 Johns. R. 168, 169. It makes no difference as to the consequences, whether such notice was *actual* or merely *constructive*. Sugden's law of Vendors, 490. 1 Cowen, 644, 642, 622. Newl. on Contr. 511. 9 Wheaton, 498, 499. 8 id. 445. 447. 2 Sch. & Lef. 327. 6 Wendell, 226, 227 Whatever is sufficient to put a party upon inquiry is sufficient notice. References ut supra, and 1 Hopk. Ch. R. 55 ; 12 Johns. R. 343, 345 ; 4 Cowen, 722 ; 4 Johns. Ch. R. 38 ; 3 id. 345 ; 3 Conn. R. 146 ; 13 Vesey, 120 ; 2 id. 440 ; 1 Johns. Ch. R. 267 ; Powell on Powers, 111 ; Sugd. Law of Vend. 469, 499, 506 ; 2 Sch. & Lef. 481. It matters not whether the fraud were committed against a party to the fraudulent transaction, or against third persons not parties thereto. 1 Burr. 474. 2 Ves. sen. 156. 3 Cowen, 538, 576, 577, 578. Rob. on Fraud. Conv. 597. Fraud will invalidate in a court of law as well as in a court of equity, and annul every contract and every conveyance affected with it. 10 Johns. R. 463. 1 Burr. 397. id. 395, 6. 6 Harr. & Johns. 255, 281. 4 Day, 293, 4. 5 id. 344. 4 Harr. & M'Hen. 404. 3 Black. Comm. 430, 431, 437, 438, 9. 7 Wendell, 385, 6. Therefore, in this view also, the demandant has shown a good paper title.

The demandant therefore is entitled to recover, unless either the wills on the one hand, or the deed of Edward Gould to the demandant on the other, were void on account of an adverse possession existing at the time ; or that the wills or the deed were rendered void and inoperative on account of a *disseisin in fact* existing at the time. It is well settled that a devise is good, and the devisee takes all the estate, notwith-

standing an adverse possession at the time.  2 Dowl. & Ryl. 38, 41, 42, 43.  7 Cowen, 238.  2 Wendell, 166.  1 Peters, 571, 572.  3 id. 127, 128, 136, 175, 176.  3 Marshall, 505, 508. The deed from Edward Gould to the defendant would pass the estate, notwithstanding an adverse possession at the time, because as to part it was a conveyance under a decree of the court of chancery, and therefore valid.  2 Wendell, 204; 6 id. 224 : and for the residue, although ordinary, it was a conveyance from a trustee to his *cestui que trust*, and therefore valid; for neither party. in such case, " buy or sell," in the words of the statute, nor is such a conveyance within the mischiefs, which the statute to prevent champerty was intended to guard against.  1 Aiken, 16, 21, 24.  Laws of Vermont, vol. 1, p. 196, § 1.  6 Wendell, 224.  There is and has been no disseisin of the premises in question.  No holder has ever acquired a seisin by wrong.  6 Johns. R. 217, 218.  1 Johns. Cas. 36, 49, 85, n.  20 Johns. R. 491.  2 Dowl. & Ryl. 40 to 43.  2 Wendell, 166, 203.  12 East, 155.  5 Burr. 2604.  7 Wheaton, 107.  11 Com. Law R. 343, 344.  5 Cowen, 374. The true owner could not be disseised, inasmuch as the true owner never actually entered, and therefore could not be actually turned out of possession.  1 Barn. & Ald. 86.  12 East, 155, 152, 154.  1 Johns. Cas. 43, 37.  Adams on Eject, 54, 55, Ballantine on Limitations, 25.  2 Ld. Raym, 830.  2 Salkeld, 423.  The entry was either in fact under the true title, or was with claim of true title, and therefore could not be tortious, within the meaning of a tortious entry, to constitute a disseisin.  20 Johns. R. 306.  10 id. 435, 441.  16 id. 116. 4 Day, 295.  3 Marshall, 463.  2 Dowl. & Ryl. 40, 42.  7 Mass. R. 383.  1 Johns. Cas. 49, 33, 36.  2 Caines' Cas. in Err. 316.  6 Johns. R. 197, 215, 217.  2 Greenleaf, 242.  5 Cowen, 134.  3 Greenleaf, 120.  As the defendant's interest, as well as that of those who devised to her, was contingent under executory devises, neither she nor they could be disseised, because they were not actually seised until the contingencies happened.  1 Preston on Estates, 221, 225, 244, 242, 261. 5 Litt. R. 308, 312, 313.  2 Cowen, 390.  The deeds under which the tenant claims title were void, and no possession

under them could operate as a disseisin. 7 Wendell, 152. 9 id. 524, 533. 9 Wheaton, 551, 541.

There is no bar to the right of the demandant, or there has been no adverse possession at least until within the last twenty-five years before the bringing of this suit. The first possession was under an executory contract, which was not adverse to the true title. 6 Cowen, 401. 5 id. 74, 129. 1 id. 610. 12 Mass. R. 325. 1 Marshall, 506, 27. 1 Monroe, 36. 2 Nott & M'Cord, 417. 3 Litt. R. 34. 5 id. 318. Litt. Sel. Cas. 423, 444. 9 Wheaton, 288. 4 Mass. R. 64. 2 Haywood, 594. The first possession was not sufficiently marked by definite boundaries, nor continued without interruption. 2 Johns. R. 234. 1 id. 156. 8 id. 227, 8. 9 id. 168. 1 Haywood, 320, 1. 3 Wash. C. C. R. 475, 479, 480. S. C. Journal of Jurisprudence, 255. 9 Cowen, 653. 10 Johns. R. 477. 1 Harr. & Johns. R. 545. 12 Johns. R. 367, 8. Cooper took a void title, which he knew, or was bound to know, was void. 9 Wendell, 511, 524, 533. 5 Cowen, 346. 350. 6 id. 751. 9 Wheaton, 541, 551. 2 Peters, 241, 242. 11 Wheaton, 90. 4 Littell, 310. 12 Johns. R. 365. 4 Day, 294. 5 Pick. R. 20, 27. 15 Mass. R. 113. 4 id. 492. 2 N. Car. Law Repos. 400. 7 Wendell, 152. Cooper and those claiming under him, at least until 1808, when M'Collum took his deed for one part, and until 1817, when Gilchrist took his deed for another part, having the share of Mrs. Evans, had notice of other interests in the lands ; and having acquired no other interests in the fee than those belonging to Mrs. Evans, they stood in her place, and became, as she was previous to her death, tenant in common with the owners of those other interests. 4 Dessaus. Ch. R. 522, 528, 474. 5 Har. & Johns. 226. 1 Wash. R. 41, 216, 217. 2 Mason, 536. Adams on Ejectment, 50. 1 M'Cord's Ch. R. 360. 10 Mass. R. 468. 9 Johns. R. 174. If Cooper, under whom the tenant professes to make title, succeeded in obtaining (by the deed which he took on the 11th June, 1796,) the interest of Mrs. Evans in the fee of the land, then, although he failed in acquiring the interests of the other owners, yet his entry under Mrs. Evans' title was congeable and consistent with every ex-

isting claim, and therefore adverse to none of them. 4 Day, 295. 3 Serg. & Rawle, 386, 381. 9 Johns. R. 179. 180. 13 id. 116. 20 id. 301. 10 id. 292, 293. 5 Cowen, 530, 1. 3 Murphy, 166. 2 Bibb, 506, 7. 2 Greenleaf, 403. 3 id. 207. 3 Wendell, 337. 4 Wheaton, 221, 222. Adams on Ejectment, 54, 55. 10 Com. Law, R. 129, 130. 10 East, 583. 8 Wendell, 181. If the tenant and those under whom he professes to derive title claim to have obtained the title of the demandant, and have gone into possession under color and claim of such title, then their posssession is knit to that title, and can by no possibility be adverse thereto ; and if they have not obtained that title, then their possession can never, in contemplation of law, be severed from it, nor be set up as adverse to the true owner. 10 Johns. R. 292, 3. 20 Johns. 301. 16 id. 116. 8 id. 101. 10 id. 441. 3 Wendell, 337. If Gen. Schuyler had a life estate, then, whether he conveyed it to Cooper through Edward Gould or not, no adverse possession could be taken against the demandant until such estate ended. 3 Littell, 282, 3. 5 Cowen, 96, 102, 3. 8 Johns. R. 269. 4 id. 390. 10 East, 583. 9 Mass. R. 377. 5 Conn. R. 228. 10 Com. Law R. 225, 6. 3 Binney, 374. Because, the fee of the demandant, although vested absolutely under the wills did not authorize her to take possession until, *first*, she was married with consent ; *second*, until she arrived at the age of 21 years ; or, *third*, until the death of Gen. Schuyler, on the 18th November, 1804, and therefore no adverse possession could be commenced against her *until her last right of entry* accrued. 2 Wendell, 366. 1 Pick. R. 327. 15 Mass. R. 472. 9 id. 509. 10 Pick. R. 362. 2 Vesey, sen. 482. 4 Johns. R. 390, 402. 8 East, 566.

Admitting there has been an adverse possession, yet, on account of the savings in the statute of limitations, the demandant is not barred. See Rev. Laws of 1813, vol. 1, p. 185, § 2. Because, 1. If her seisin accrued under Edward's Gould's deed of October 1804, adverse possession before that time had not continued for the requisite length of time ; and although it should be deemed to have begun to run as against Edward Gould, it did not continue to run as against her, because she was then a married woman. But if an adverse possession had

commenced in 1796, it had been continued only eight years, to 1804, when the deed from Edward Gould to the demandant was executed, and only twelve years had elapsed after her disability ended, in 1817, when she brought her suit. 1 R. L. of 1813, p. 185, § 2. 18 Johns. R. 228. Ballantine on Limitations, 59, 60. 1 Bibb, 260. 4 Taunt. 830. Sugden's Vendors, 256, 347. If the seisin of the demandant is under the wills, then it did not vest absolutely so as to entitle her to take possession until her marriage, 16th April, 1799, or on her coming of age, 10th August, 1801, or on the death of Gen. Schuyler, 18th November, 1804; and in either case she is protected, as she was then under the disability of *coverture*, and so continued until the 16th June, 1817. 1 R. L. of 1813, p. 185 § 2. If her seisin and right of entry to one part (viz. one twelfth under Martha Bradstreet's will) should be deemed as vested in 1782, on the death of Martha Bradstreet, yet she is protected, inasmuch as she was then under age, and so continued until her marriage, and for more than two years afterwards; and cumulative disabilities are allowed under that section of the statute of limitations which relates to real actions. 1 R. L. of 1813, p. 185, § 2. By an examination of the statute of 32 Henry 8, ch. 2, Statutes at Large, octavo ed. vol. 3, p 291, it will be perceived that the second section of the " Act for the Limitation of Criminal Prosecutions and of Actions at Law," 1 R. L. of 1813, p. 185, embraces the provisions of that act; but that the statute of 32 Hen. 8, ch. 2, contains no proviso similar to that of our statute, which is in fact differently worded from any proviso that is to be found in any other statute of limitations whatever. The statute of 32 Hen. 8, ch. 2, contains no savings, except only for persons who labored under disabilities at the time the statute was made. Sugden's Law of Vendors, 253, 254, 344, 345. Every statute of limitations being in restraint of right must be construed strictly. 14 Johns. R. 479. 2 Bos. & Pull. 547. Ballantine on Limitations, 55. The doctrine that when the statute of limitations once begins to run, it continues to run notwithstanding any subsequent disability, is not universally true: for a war suspends the operation of the statute of limitations between the citizens of the two countries for the time during

which such war continues. *Wall* ads. *Robinson*, 2 Nott & M'Cord's R. 498. *Ogden* v. *Blackledge*, 2 Cranch's R. 272. And cases of want of parties, whereby a temporary suspension of legal remedy takes place, will also suspend the operation of the statute of limitations. 8 Cranch, 92, 93. Statutes of limitations do not operate against a person to whom neglect or wilful laches are not imputable. 3 Conn. R. 193. 2 Nott & M'Cord, 499. 5 Cowen, 103, 96. All the cases in which statutes of limitations have been held to preclude cumulative disabilities have been cases of possessory actions, and where, after the first disability was removed, the party was for a time free of disability, and might have entered before he fell under the second disability, which, it was held, should not be allowed to cumulate. *Doe, ex dem. Duroure*, v. *Jones*, 4 T. R. 301. *Doe, dem. Griggs et. al.*, v. *Shane*, 4 T. R. 306, 307. Or, where the statute had begun to run against the ancestor, who was free of disability, and the right subsequently devolved upon his heir laboring under disability. *Stowel* v. *Touch*, Plowden, 353. And this is the view taken of this question by Mr. Ballantine, in his treatise on the statute of limitations, p. 70. In *Demarest* v. *Wynkoop*, 3 Johns. Ch. R. 139, Chancellor Kent relied upon *the words* " at the time such right or title first descended or accrued," &c. in the proviso of the statute in relation to possessory actions, as sustaining his position in relation to cumulative diabilities. No such words are contained in the proviso to the section relating to the limitation of real actions, but words of a directly contrary import.

It is objected that the demandant is an alien, and cannot therefore recover ; to which it is answered, that even at common law an alien may take by purchase a freehold, or other interest in land, and may hold it against all the world except the king; and even against him, until office found. 3 Wheaton, 589, 599. 4 id. 453. 11 id. 355, 356. 1 M'Cord's Ch. R. 374, 375, 376, 381. 12 Mass. R. 143. 7 Wendell, 368. 1 Johns. Cas. 401. 3 id. 113, 120, 121, 325. An alien may take lands by devise, Powel on Devises, 209 ; 7 Wendell, 368 ; 7 Cranch, 603, 619; notwithstanding the devisor was also an alien enemy at the time of making his will, and at the time of his death. *Jackson, ex dem The People*, v. *Clarke* 3

Wheaton, 1, 12. So an alien may maintain an action for his land ; 3 Johns. Cas. 121 ; id. 325 ; unless during war, when his right to bring suit is suspended until the return of peace. 11 Johns. R. 418. He may maintain a real action, though he cannot take by descent, except under the provisions of the treaties between the United States and Great Britain. 3 Peters, 99. The demandant and those under whom she derives title, being British subjects, their rights were protected by the 6th article of the treaty of peace of 1783, between the United States and Great Britain. 4 Wheaton, 453. And under the 9th article of the treaty of 1794, between the same powers, it is not necessary for the alien to show that he was in the actual possession or seisin of the lands at the time of the treaty, which applies to the title, whatever that may be, and gives it the same validity as if the parties were citizens. 9 Wheaton, 489, 496. 4 id. 453. 7 id. 535, 539, 536, 545. 4 Johns. R. 79. The termination of that treaty by war, did not divest rights of property vested under it. 8 Wheaton, 464, 481, 489. 12 Mass. R. 143. Besides, the rights of the demandant are protected under the statutes of this state, in relation to aliens; she having been a resident of this state, since 1799. 2 R. L. of 1813, p. 541 to 544. 7 Wendell, 569, 570.

The demandant was under the age of twenty-one years, in the year 1800, and was married previously to the 4th day of June, 1800, and while under age. This appears from the consent of Sir Charles Morgan. That she was married previously to the first of November, 1799, is manifest by the release from Samuel Bradstreet ; that she was married in the year 1799 at Wexford, in Ireland, and in the same year came with her husband to this state, and that they became inhabitants of this state, and residents within the same, is proved by the decree of divorce pronounced 16th June, 1817. These documents are good evidence to prove the pedigree, age and marriage of the demandant. 8 Johns. R. 131, 135, 136. 15 id 226. 5 Cowen, 238, 239. 1 Starkie's Ev. p. 1, § 35, p. 55, 56, § 38, 41, 46, 77, p. 58, 59, 62, 69 to 71. 1 Phil. Ev. 187, 188, 195, 196, 197. Matthews' Presump. Ev. 268 to 272. id. 8. The supposed admissions in the will of Mrs. Evans, of a want of legal title prior to Schuyler's deed, are no evidence

against the demandant although Mrs. Evans and the demandant were *tenants in common.*   4 Cowen. 483, 492.

It is urged that the question of the demandant's title has been before the supreme court of the United States, and has been conclusively decided against her, in the opinion pronounced by Mr. Justice Johnson, in the case of *Bradstreet* v. *Huntington*, 5 Peters, 402.   Upon an examination of that case it will be found, that in fact nothing was decided by it in relation to the merits of the demandant's title.   The cause went up upon a bill of exceptions, and the question turned upon the judge's charge, which presented nothing definite.   It appears, by the report of the case, page 443, that there were but six judges on the bench and that three of them differing from judge Johnson, and two concurring with him on that point of the case, it was a matter of course that the plaintiff must fail in her writ of error, because the court were equally divided, so far as numbers were concerned.   But a perusal of that case will farther show, that all in it upon which the tenant affects to rely as law, are Judge Johnson's individual views. Page 435.   The observation of Judge Johnson, that "whatever be the English doctrine, and that of other states, as to the right of election to stand disseised or not, it is certain that the New-York courts have denied that right, both as to devises and common law conveyances, without the aid of a statute repealing the common law, page 436, shows that the learned judge had not taken a full view of the law as it is understood here. But if Judge Johnson's views were supposed to be entitled to all the respect due to the unanimous opinion of the court, still they cannot be considered as conclusive authority in a case where the title principally relied on is totally different from that which was set up by the plaintiff, in the case in which he delivered his opinion.   In that case the bill of Evans and wife against Gen. Schuyler, and the answer of Gen. Schuyler thereto, were not before the court; nor was there any proof of a resulting trust, nor even an intimation that any resulting trust existed.   All the evidence set forth from page 403 to 410 of the report of the case, 5 Peters, showed nothing more than a direct trust in Gen. Schuyler.   The deed to Potter was given several years previous to Schuyler's deed to

Mrs. Evans and Edward Gould; and not after that deed, as was the case with the deed from Edward Gould and others, executors of Mrs. Evans, to William Cooper. But even if the opinion given in the case of *Bradstreet* v. *Huntington* had been the unanimous opinion of the court upon a case precisely similar in every respect to that now before this court, it would not be conclusive upon this court; but on the contrary, the decisions of this court would be looked to by the supreme court of the U. States as binding authority on them, in all cases where the laws of real property are settled, " whether these decisions are grounded on the construction of the statutes of the state, or form a part of the unwritten law of the state, which has become a fixed rule of property.' 12 Wheaton, 153. 6 Peters, 298, 299. 5 id. 155, 156. 2 id. 678, 679. 1 id. 571, 572. 10 Wheaton, 152. 6 id. 119. 5 id. 279. 2 id. 316. 9 Cranch, 87. 6 id. 165. 5 id. 255, 221. id. 22.

The principal ground relied upon by the tenant on the trial, was that of a disseisin of the demandant, or at least an adverse possession to bar her recovery. The question whether or not a party has been disseised is not a question of law, but of fact to be found by the jury. 1 Johns. Cas. 49. 1 Burrows, 113. The grand assize have not found such fact, but on the contrary, their verdict completely negatives every presumption of a disseisin. The question whether or not a possession is adverse is a question of fact, and must be determined by the jury and not by the court. 9 Johns. R. 102. 13 id. 496. 1 Paine, 466. 14 Mass. R. 55. 10 id. 468. 5 Wheat. 124. 1 N. Hamp. R. 34. 2 Aiken, 112. 7 Mass. R. 383. 2 Har. & M'Hen. 76. 1 Hopkins' Ch. R. 449. Where the judge directed the jury as to that fact, a new trial was granted. 9 Johns. R. 102. 12 Com. Law R. 359. The grand assize have determined the question in favor of the demandant, and the verdict is *not* against *law*, nor against *evidence*, nor against the right of the case.

The allegation in the count on a writ of right, of seisin in the demandant, " by taking the esplees thereof to the value, &c. (of ten shillings and more in rents, corn and grass.") Archb. Civ. Pl. 455. 3 Black. Com. app. 4, evidently shows

# 640

CASES IN THE SUPREME COURT

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

that it was originally introduced, not for the purposes of show-
ing the demandant's right to recover because he was seised ;
(for he would clearly have been equally well seised if the
esplees were of the value of nine shillings or less, as he
would have been if those esplees were of the value of ten
shillings and more ;) but for the purpose of sustaining the ju-
risdiction of the court of common pleas, after the cause should
be removed thither : either by writ of pone from the county
court, whether it had previously been removed frm the court
baron, by writ of tolt ; or by writ of right *quia dominus remisit
curiam*, by which it is brought immediately to the common
pleas. 3 Black. Comm. app. 1, to 3. Booth on Real Actions, 91.
But as the reason of the form cannot exist in this country, it
has been determined that (although the allegation is continu-
ed in our forms, yet) "it cannot be admitted that the taking
of the esplees is a traversable averment in the count ;" *Green*
v. *Liter et al.*, 8 Cranch, 246 ; and not being a traversable
averment, it is not necessary to prove it. 8 Cranch, 246, 247.
The allegation in the demandant's count, that she was seised
of the premises " in the time of peace, to wit, within twenty-
five years now last past, exclusive of the time during which
she the said Martha Bradstreet was within the age of twenty-
one years, or *feme covert*," is in exact conformity to the pro-
viso in the second section of the statute of limitations, 1 R. L.
of 1813, p. 185 ; and the grand assize, by their verdict,
have found the facts stated in his allegation to be true.

" The court will not grant a new trial in a writ of right,
particularly where the mise has been joined upon the mere
right, unless the verdict be flagrantly wrong." Archb. Civil Pl.
465. *Tyssen* v. *Clarke*, 2 W. Black. 491, 492. Even in or-
dinary cases, where the jury consists of only twelve persons
drawn by lot, the court will not set aside a verdict as against
evidence, unless it be clearly so, though it be directly con-
trary to the charge of the judge. 7 Cowen, 215, 217. 8 id.
225. 6 id. 683. 5 Wendell, 48, 53. 4 id. 426. 2 id. 563,
356. 7 id. 384, 160. 2 Nott & M'Cord, 261, 264. 4 Wash.
C. C. R. 157, 36, 37. 3 id. 58. 15 Johns. R. 495, 496. 4
id. 402, 403. 7 Mass. R. 264, 265. 10 id. 39, 42. 1 Bur-
rows, 397. 3 Wilson, 63, 45, 47. 1 id. 22. 2. Strange, 1142.

2 Binney, 495. 4 Conn. R. 427. 4 Maule & Selw. 200 to 202.
3 Black. Comm. 392. And even if the verdict be against evi-
dence, if it be such as is consistent with the justice and equity
of the case, the court will not disturb it. 4 T. R. 469, 470.
3 Wilson, 273. 2 id. 362, 306, 307. 2 W. Black. 1221, 1222.
2 Burrows, 936, 665. 1 id. 11, 12. 3 id. 1306. 2 Salkeld,
644, 646, 648, 653. 4 Verm. R. 31. 3 id. 76.

As "the courts of common pleas of this state never had
jurisdiction of writs of right," 4 Wendell, 215, 216, the third
section of the act in 2 R. L. of 1813, p. 141, has nothing to
do with this case.

*A. Van Vechten,* (for tenant) in reply, commenced his argu-
ment by insisting that the demandant had failed to prove a
*seisin in fee in herself* as set up in her count, and consequent-
ly was not entitled to recover ; and cited 19 Viner, 312, n. 2.
4 Rep. 9, Beviles' case, Co. Litt. 272, a., 7 Wendell, 250. He
observed, that the demandant had attempted to make out a
legal estate and seisin, through *Gen. Bradstreet,* by showing,
1. That Bradstreet had become entitled, by way of *resulting
trust,* to a part of the patent of Springfield, by virtue of a pur-
chase thereof, made by *Gen. Schuyler,* with Bradstreet's mon-
ey, and that by the operation of the statute the legal estate
vested in Bradstreet ; 2. That on a partition of the premises,
lot No. 32 was allotted to Schuyler, in trust for Bradstreet ;
3. That Bradstreet, by his will, devised his real and personal
estate to his two daughters, Martha and Agatha, as tenants in
common ; 4. That Martha, one of the testator's daughters,
devised one third of her real estate to the demandant and her
brother, and one other third to Elizabeth Livius ; and 5. That
Elizabeth Livius appointed the demandant the sole heir of her
real and personal estate, subject to certain contingencies ;
and the counsel then remarked, that from this statement of
the title of the demandant, it was manifest that she acquir-
ed no legal estate or seisin in the premises through Gen.
Bradstreet, for whatever estate he had, *he had devised in
joint tenancy to executors,* to enable them to execute the trusts
expressed in his will. The wills, therefore, of Martha Brad-
street and Elizabeth Livius did not pass, and could not pass,

to the demandant either a legal estate in fee, or an actual seisin, inasmuch as both the testatrixes had only an *equitable interest*, as *cestui que trusts*, in the avails of the real estate, when sold by Gen. Bradstreet's executors. But he insisted, if even the demandant had become entitled as *devisee* to an estate in fee, that it is a principle well settled that a devisee cannot maintain a writ of right before entry. 1 H. Black. 1. 1 Sch. & Lef. 104, 622. 5 Taunt. 326. Here no such entry was proved or pretended. On the contrary, the will of General Bradstreet, he contended, showed conclusively that no right of entry was intended to be given to either of his daughters or their devisees.

The counsel next observed, that the demandant, as if distrustful of the sufficiency of her title as *devisee*, had brought forward in support of her claim, 1. The release from General Schuyler, surviving executor of Gen. Bradstreet, to *Agatha Evans*, one of the daughters and devisees of Gen. Bradstreet, and to *Edward Gould*, described in the release as the *attorney of Sir Charles Gould*, sole executor of the will of Martha Bradstreet, to the recitals in which and to the general tenor of the instrument the counsel adverted; 2. The decree of the court of chancery, made on a bill filed by the demandant and her then husband, Matthew Codd, against Edward Gould and Samuel Bradstreet, to the substance of which the counsel also adverted; 3. A release from Edward Gould to the demandant, upon the recitals and substance of which the counsel commented, and then observed, that from the evidence thus produced by the demandant herself it appeared conclusively from her own showing, that she had no estate in fee, or actual seisin of any of the lands left by Gen. Bradstreet, and devised by the wills produced by the demandant, *prior* to the conveyance from Gould; but that on the contrary, the legal estate and seisin were in Schuyler, until his conveyance to Gould, in whom they remained until his conveyance to the demandant; 5 Peters, 430, and 4 id. 83, and cases cited in each. How then, asked the counsel, has the demandant made out the legal estate and seisin in herself? and if she has failed to do so, the verdict of the grand assize is against both law and evidence. But to remove all pretence of dispute

on this point, he said the *tenant* had shown a conveyance in fee from *Edward Gould* (under the deed of Schuyler) to *William Cooper*, for a valuable consideration paid, of all Gould's interest as trustee, in and to the premises in question; and the tenant had proved by indubitable evidence, an actual and continued possession and exercise of exclusive ownership by Cooper and the persons holding the premises under him ever since the date of Gould's conveyance. How, then, could the demandant have the legal estate and actual seisin of the premises in question, when she brought this writ of right, inasmuch as the legal title and actual seisin were vested in Cooper *eight years* before Gould's release to her? From this review of the defendant's evidence, and the authorities cited on the part of the tenant, he contended it was manifest, 1. That the demandant acquired no legal estate under the wills of either of her devisees, inasmuch as neither of them had any thing more than an equitable interest as *cestui que trust*, under the will of Gen. Bradstreet; 2. That should it be conceded, for argument's sake, that her devisors, or either of them, had a legal estate, the devises to her did not give her such actual seisin as she counts upon, and without proving which she cannot maintain this writ of right: 3. That she is concluded by her own evidence from denying the legal estate and seisin to have been in Schuyler as trustee under Bradstreet's will, for the fulfilment of the trusts therein expressed, till the 16th of May, 1794, when he conveyed to Gould, and from that time to have been in Gould for the same purpose until he sold and conveyed the premises in question to Cooper, in 1796, eight years prior to the conveyance from Gould to her; 4. That she is equally concluded by the decree in her favor and the conveyance from Gould to her in pursuance thereof, from claiming an estate in fee, or actual seisin of the premises in question, under the deed from Gould to her in 1804, inasmuch as neither the decree or conveyance were intended to embrace, or did embrace the premises in question, which had been before sold and converted into money by Gould, in execution of his trusts and from any accountability for which Gould was in express terms exonerated by the decree; and if so, how can the verdict of the grand assize in this case be supported?

But it is contended that, upon the execution of the sheriff's deed to Schuyler, a trust resulted by operation of law in favor of Gen. Bradstreet, for the premises purchased with his money, which by the statute of uses vested the fee in Gen. Bradstreet. Be it so: then was it not competent for Gen. Bradstreet to devise the estate in joint tenancy to his executors in fee, to enable them to execute the trusts created by and specified in his will? This cannot be denied. Hence the doctrine of resulting trust can have no bearing to establish the demandant's title and seisin as she has counted. Nor can the demandant sustain her writ of right upon any alleged construction of Gen. Bradstreet's will, that his daughters took the legal estate as devisees under the will, inasmuch as the law is well settled that a devisee cannot maintain a writ of right for want of actual seisin before entry. And here is no evidence of any entry by any of the devisees, but on the contrary, it is conclusively proved that the actual seisin has been in the *tenant*, or those from whom his title is derived, ever since the death of Bradstreet.

It is also insisted, that by the will of General Bradstreet, his executors took only a life estate as joint tenants, and that upon the death of Schuyler, in the fall of 1804, the remainder vested by operation of law in the daughters of Bradstreet, or their devisees. The answer to which is, that by the terms of Gen. Brdstreet's will, "notwithstanding his former devise for the benefit of his wife and daughters, he devises his landed estate in joint tenancy to his executors, upon the trusts specified." It cannot be necessary to cite authorities to establish the position that the devise of a man's *real* or *landed estate* passes the devisor's *whole interest* in the estate to the devisees as fully as if the devise had been to them, their heirs and assigns. If so, the pretence in this case that Gen. Bradstreet's executors took only an estate for life, is wholly gratuitous, and unfounded. Again; in construing wills, the intent of the testator to be collected from the whole instrument must govern. What was Gen. Bradstreet's intent, as expressed in his will? The objects of his bounty were two females, residing as the demandants counsel have stated, in England, and the

lands in question were situated in this country. Is it not apparent, from these circumstances, that General Bradstreet's intentions were to give the controling power of selling his real estate here to his executors, as being more competent to dispose thereof advantageously for the benefit of his daughters, to whom he directed the avails to be paid, charged with the provision for his wife? How would the intent set up, of limiting the interest of his executors to a life estate, consist with his obvious views of creating the trusts for the benefit of his daughters? Suppose the executors had both died within a short time after the testator, can it reasonably be urged that he intended to limit the executors to sell forthwith, when by the terms of the will he gave them an absolute discretion as to the time and manner of sale, as they should deem most beneficial for the *cestuis que trust?* It is also a well settled rule of law, that when a devise is made in trust, with power to sell for the execution of the trusts, the devisees or trustees take a fee, to enable them to carry into effect the intent of the testator. Nor does this construction of Gen. Bradstreet's will conflict with or jeopardize the just rights of his daughters, or contravene the legal intent of the testator. The trustees were of his own selecting, and their selection denotes his confidence in their fidelity and responsibility, and in the settled rules of law, that upon their death no obstruction would arise to the due execution of the trusts: for in the event of their death, the estate would pass, by operation of law, to the heirs of the surviving joint tenant, subject to the trusts. And this court need not now to be informed that our court of chancery has now, and had before the revolution, competent power to enforce the execution of the trusts, either by the heirs of the surviving joint tenant, or by the appointment of new trustees, under the direction of the court. Allusions have been made, in argument by the opposite counsel, to the revolutionary scenes that were approaching and anticipated when General Bradstreet made his will; and this is inferred from his selecting Mr. Smith, a known royalist, and Philip Schuyler, a revolutionary patriot, for his trustees. Be it so; then one object of this selection was to secure the property against the hazards which the revolution might produce. Is it probable, then, that Gen.

Bradstreet, under the influence of such views and anticipations, meant the legal estate of his large landed interest in this country should vest in his daughters, and thereby the hazards of forfeiture be increased? But there is another fact disclosed by the demandant's own evidence in the answer of Gen. Schuyler, that Gen. Bradstreet's object to be kept out of view in the purchase by Schuyler, was to avoid giving offence to the Duke of Grafton. How is the intent that General Bradstreet, by his will, meant in any event to vest a fee in his daughters reconcileable with the object of his keeping out of view his interest in the lands purchased by Gen. Schuyler for his benefit? But admitting the demandant's construction of Gen. Bradstreet's will, two insuperable obstacles remain to be overcome by her in order to maintain her writ of right: 1. The want of actual seisin in her, as devisee, under any of the wills which she sets up; and 2. Her being estopped by her own evidence from denying the legal estate and seisin of Edward Gould, the grantor of William Cooper, under whom the tenant holds, and the legal operation and effect of her decree against Gould, and his release to her in 1804, excluding the premises in question as having been previously sold and converted into money by Gould in execution of his trusts.

Again; it is said, that the executors of General Bradstreet were accountable for the sales of his real estate to his daughters personally; ergo, their power to sell ceased upon the death of Martha Bradstreet, in 1781. This position is utterly inconsistent with the former, that the executors of General Bradstreet took an estate for life, coupled with a power to sell during life. But can it be denied that the interest of Martha Bradstreet as *cestui que trust* under the will of her father was devisable, and would enure to the benefit of her devisees, or other legal representatives, to whom her trustees would by law be accountable for the execution of their trust? If it were otherwise, what would have become of the interest of Martha Bradstreet as *cestui que trust,* in case she had died immediately after the death of her father? Would her death have discharged the executors from their accountability? If not, would not the law have made them accountable to her devisees or legal representatives?

It is next argued that Gen. Schuyler's conveyance to Gould, as the attorney of Sir Charles Gould was repugnant to Schuyler's duty as trustee, and therefore cannot prejudice the rights of the demandant. This conveyance being part of the demandant's own title, and evidence to maintain her writ of right, she is estopped from denying its validity, inasmuch as she has attempted to deduce her title through Gould under that very conveyance. She has, in connection with Schuyler's conveyance, given in evidence the bill in chancery of Evans and wife against Schuyler, together with his answer. From both which documents it appears that Schuyler held the legal estate in trust; and from his answer it also appears that Gould produced a legal power of attorney from Sir Charles Gould, the executor of Martha Bradstreet, authorizing Gould to treat with Schuyler on behalf of Sir Charles Gould for the avails of Gen. Bradstreet's estate which might be in, or come to his hands, as executor, &c. in which Sir Charles Gould had an interest, as executor of Martha Bradstreet; and that for the purpose of facilitating the conversion of the real estate of Gen. Bradstreet by Gen. Schuyler, agreeably to Bradstreet's will the former authorized Mrs. Evans after the death of Martha Bradstreet, and Edward Gould, the authorized agent of Sir Charles Gould, to make contracts for the sale of parts of the real estate, which he, Gen. Schuyler, would carry into effect. This evidence of the demandant also shows that Edward Gould acted under the authority of Sir Charles Gould, and was so recognized by Gen. Schuyler; but it further shows that Gen. Schuyler, in 1780, was recognized by all the parties interested as claimants under Gen. Bradstreet's will, as having the legal estate, and as being the only person (his co-executor Smith being then dead) who had legal authority to sell and convey the real estate; and therefore disproves that the demandant then had, or could pretend to have, any legal title to, or seisin, of Gen. Bradstreet's real estate. These proceedings in chancery, and the facts they disclose, being followed up by Schuyler's conveyance in 1794 to Mrs. Evans and Gould, without any decree being produced upon the above bill and answer, show that the latter conveyance was an amicable arrangement, under the advice of counsel, as may be presumed from

the above proceeding, with the concurrence of all parties to exonerate General Schuyler from his trusts, and to place the power of executing those trusts, so far as related to Gould, in the hands of the latter. This is confirmed by the decree of 1803, in favor of the demandant, against Gould as trustee of Mrs. Livius and Gould's conveyance to the demandant, pursuant to that decree in 1804; by which she is also estopped from denying his legal title as trustee, and his power and authority to sell and convey in that character. By the decree against Gould, his authority as such trustee is explicitly recognized; and the terms and provisions of the decree, being without costs, manifest that he was not charged with any improper act in relation to the trust, but on the contrary, the decree ratifies his acts as to the property converted into money by sale, and exonerates him from accountability for the avails of the property so converted. And here it is also to be remembered that the decree directs an account to be taken by a master, of the property which Gould held in trust or had converted into money: but the demandant has not produced any such account. Why? The only reason that can be given for its non-production is, that as each of the parties were to pay his own costs, they agreed to Gould's account as rendered between themselves, in order to save expense. Hence it may justly be inferred that Gould then accounted satisfactorily for all the trust property and the avails thereof, and paid over to the demandant's husband, Matthew Codd, what the decree required should be paid, or transferred to him, and the demandant thereupon accepted the conveyance from Gould of the remaining real estate which he held in trust, in full discharge of his trust; and that conveyance as well as the decree, clearly exclude the premises in question, which Gould had in 1796 converted into money, by the sale and conveyance to Cooper.

The above reasoning against the demandant's present claim is fortified by the will of Agatha Evans, which the demandant also gave in evidence, devising the residuary real and personal estate of the testatrix to her executors, Richard Harrison, Charles Wilkes and Edward Gould, and the survivors and survivor of them upon trust; 1. To sell the same, and invest the money in their own names, and apply

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

the same as directed by her will, with a proviso that they should, during the lives of Mr. and Mrs. Symington, obtain their consent to such sales; 2. The will then recites that the testatrix, with other persons claiming under Gen. Bradstreet's will, had executed conveyances to purchasers of land which did not vest the fee in such purchasers, and therefore the testatrix empowered her executors to execute proper deeds to the purchasers to vest in them the fee of her share of the lands so sold. This will was no doubt drawn by Mr. Harrison, who it states had assented to become one of the trustees, and bearing date about five months after Gen. Schuyler's conveyance to Mrs. Evans and Edward Gould, furnishes persuasive evidence that the latter provision was intended to obviate the defects in sales which had been previously made by her and her co-claimants under Gen. Bradstreet, while the legal title remained in Gen. Schuyler, as in the case of the conveyance to Potter, in 1790, stated in the report of the case of the demandant against Huntington, 5 Peters, 430, &c; and being the demandant's own evidence, proves decisively that prior to the date of Schuyler's deed to Mrs. Evans and Edward Gould, the claimants under General Bradstreet had no legal title. Where, then, is the evidence in this case to prove that the demandant ever had an estate in fee on actual seisin of the premises in question. It is said by the counsel for the demandant that the decree against Edward Gould only recognizes him as the trustee of Mrs. Livius, but has no reference to Martha Bradstreet's share of the estate. How did he become the trustee of Mrs. Livius? The demandant has not seen fit to produce the bill and answer. What follows? The deed from Schuyler to Gould recites the wills of Martha Bradstreet, who devised to Mrs. Livius a part of her estate, as well as the will of Mrs. Livius, and conveys to Gould, subject to the equitable interests of the *cestius que trust* under those wills. Then, in the absence of any other proof relative to Gould's trusts, is not the deduction irresistible that the decree refers to the trusts vested in him by Schuyler's deed? And is not this deduction rendered conclusive against the demandant, by her acceptance of the conveyance from Gould, as trustee, under the deed

from Schuyler, of the whole real estate which he then held, and which had not been converted into money, pursuant to his trusts?

The counsel for the demandant next urge that the demandant was a *feme covert* at the times of the decree in her favor and the conveyance from Gould to her. Ergo these are no estoppels against her. It is a novel doctrine that a *feme covert,* complainant in a court of chancery, is not concluded by her own decree, and her acceptance of a conveyance in pursuance thereof; inasmuch as what is done by a *feme covert* under the sanction of a court of competent jurisdiction, and especially when she is herself a complainant, cannot be impeached by reason of her coverture. Nor can the objection of her coverture impair the operation of either the decree or conveyance, when offered in evidence by herself, fifteen years after she became discovert, to establish a title in herself under such decree and conveyance, the demandant having shewn a decree of divorce in 1817. The law is too well settled, that parties and privies in blood or estate are concluded by the recitals and matters set forth in conveyances and other documents under or through which they seek to derive any title to themselves, to render it necessary now to multiply authorities to establish this position; but see 4 Peters' R. 83 to 88, and cases cited.

Again; it is said that the recitals in Schuyler's conveyance to Gould gave the latter full notice of the trusts with which the conveyed premises were chargeable in the hands of Schuyler; and this conveyance being a prominent link in the chain of title under which Gould conveyed to Cooper, carried constructive notice of the trusts to Cooper, and to the tenant as a grantee under the same title: therefore neither Cooper nor his grantees are in judgment of law *bona fide* purchasers, who can resist the demandant's title. Admit this position, for argument's sake, what does it establish? That those recitals are conclusive evidence of the facts recited against all parties and privies who claim title under the same conveyance. Then does it not follow that the recitals must, upon the same principle, conclude the demandant, who relies upon that conveyance as an important link in her own chain

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

of title ? But of what did the conveyance give notice to Cooper ? That Schuyler, being vested with the legal estate in the premises therein described as trustee, with power and directions to sell and convey the same in the execution of his trusts, did make the conveyance, with the like power and directions, to Edward Gould. Then what does this conveyance, taken in connection with the demandant's conveyance from Gould, prove ? That she acknowledged Gould as her legal trustee, with power to sell in execution of the trusts devolved upon him by Schuyler's conveyance, and that he had competent power to dispose of the conveyed premises for the fulfilment of his trusts. What follows ? Gould sold and conveyed for a valuable consideration to Cooper, pursuant to his trusts. Let it then be admitted, for argument's sake, that Cooper had constructive notice of Gould's trusts, I ask, did not the same notice inform him that the sale by Gould to him was in fulfilment of the trusts ? How then can the alleged notice to Cooper affect the validity of his purchase ? or upon what principle of law or equity can the demandant call in question the validity of Cooper's purchase and conveyance, which has been explicitly sanctioned by the decree of the court of chancery, upon which she relies to establish her legal title when, from her own evidence contained in the decree, an irresistable legal presumption arises, that Gould has satisfactorily accounted, according to the true intent of the decree, for the avails of the sale to Cooper. Again: how can the above position, even should it be admitted to be sound, avail the demandant for the purpose of shewing that she has a legal estate in the premises, or has had the actual seisin thereof according to her count, without which she cannot maintain this writ of right.

It is also said that the conveyance to Cooper was not in conformity with the deed from Schuyler to Edward Gould, inasmuch as it *did not set forth the trusts* as required by Schuyler's deed. Therefore the deed to Cooper was void. The trusts which Schuyler's deed to Edward Gould was made to enable Gould to execute, were those created by Gen. Bradstreet's will. Hence it results, as a legal consequence, that Gould's non-conformity to what Gen. Schuyler directed by

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

his deed to Gould, which was not required by the will of Gen. Bradstreet which created the trusts, cannot impair the efficacy of Gould's conveyance to Cooper in execution of those trusts; and especially when it appears from the demandant's own shewing, by the decree in her favor, that the sale and conveyance made by Gould to Cooper was absolutely sanctioned and confirmed—and the law will presume that she has received the avails thereof, pursuant to the decree. This would seem also to have been the understanding of the matter by Mr. Harrison, who the demandant's evidence shows was one of three eminent counsel consulted by the parties in interest, or their authorized agents, to advise about the legal mode of disposing of Gen. Bradstreet's landed estate for the due fulfilment of the trusts created by his will; for it will be seen, by the demandant's own evidence, that Mr. Harrison was one of the trustees appointed by the will of Mrs. Evans, one of the grantees in Schuyler's deed, who joined in the conveyance as such trustee to Cooper for Mrs. Evans' share of the premises in question, and who probably drew the conveyance without noticing the special requisition directed by Gen. Schuyler in his deed to Mrs. Evans and Gould.

The counsel for the demandant also insist that Edward Gould, by his deed to Cooper, professes to convey *in his own right* the estate which the demandant claims in the premises in question. Ergo the conveyance not being in his *character of trustee*, is void. Gould conveyed to Cooper in a twofold capacity: 1. The legal estate vested in him by the deed from Schuyler, in trust to sell and convey the same in execution of the trusts created by Bradstreet's will; and 2. The estate vested in him by the will of Mrs. Evans, in conjunction with Messrs. Harrison and Wilkes. Hence it is obvious that the words *in his own right* were inserted to distinguish what he meant to convey as vested in him solely in fee, and what as vested in him in conjunction with his co-trustees. And it would be strange indeed if the words *in his own right* should operate to defeat a conveyance of an estate in fee vested in himself, though coupled with a trust as to the application of the avails of the sale, when the conveyance was perfectly consistent with his title, and contains all the legal requisites

to pass such title in fulfilment of his trusts. But it would be marvellous that the demandant should be allowed to raise this objection to invalidate such conveyance, after it has been explicitly sanctioned and confirmed by the decree of the court of chancery in her favor, and she has excepted a release pursuant to that decree from Gould, excluding the premises by him previously sold and converted into money.

It is also urged that the conveyance from the executors of Mrs. Evans to Cooper is void, because the *consent of Mr. and Mrs. Symington*, or either of them, is not shown, which by the will was essential to the validity of the conveyance. The power of the executors to sell appears by the will, which is the demandant's own evidence ; and Mr. and Mrs. Syming-ton having an interest in the sale, and their acquiescence for 36 years proved by the actual possession and exclusive own-ership under the deed by Cooper and persons holding under him, should preclude the demandant (who has no interest in Mrs. Evans, share of the premises) from now raising this ob-jection. How can this objection avail the demandant to es-tablish her right to recover any part of the premises by this writ of right ?

It is also said that the deed to Cooper is a conveyance with-out covenants to warrant the title. The fact of its being a *conveyance by trustees* explains satisfactorily why the grantors did not covenant to warrant the title. And it would seem to be an officious objection on the part of a stranger, to defeat the title of a *bona fide* purchaser, that he was content, know-ing the character in which his grantors conveyed, to take such a conveyance from them as would pass their whole in-terest, without exacting covenants from them to warrant a title in which they had no personal interest.

It is also objected that the deed to Cooper, according to the certificate of the master endorsed thereon, was not duly prov-ed. The proof was according to the then existing law as to all except the military lands, and was taken by the late Chancellor Kent, who was then a master, &c. which of itself affords strong evidence of its legality. The deed was com-petent evidence without proof as an ancient deed, having been accompanied with actual possession and exclusive ownership

by the grantee and persons holding under him for 36 years and upwards. But admitting, for argument's sake that the objection is well taken—how can it avail the demandant in this action? From her own showing, she acquired no legal title to any part of Gen. Bradstreet's real estate prior to her conveyance from Gould in 1804; and by that conveyance and the decree on which it is founded, the lands before sold by Gould and converted into money are excluded, and Gould exonerated from accountability therefor. Again, the evidence is decisive that the premises in question have been actually possessed by Cooper and persons holding under him as absolute owners thereof, under the deed from Gould, since 1796 and prior. How then can the prevalence of this objection establish a title in fee and actual seisin in the demandant, according to her count?

The counsel for the demandant also object that the conveyances from Cooper's representatives under which the tenant holds are invalid, for want of authority in the grantors to make those conveyances. Be it so; does that vest the title of Cooper in the demandant? If not, of what consequence is it to her whether the title remains in the heirs or devisees of Cooper, or has passed to the tenant? Can she maintain her writ of right upon the title and seisin vested in the heirs or devisees of Cooper?

It is said that, according to the evidence, the possession of the premises in question by the tenant, or those through whom he acquired it commenced under an executory contract—ergo *not adverse* to the demandant. Admit that it commenced under an executory contract; the evidence proves that it was a contract for an absolute sale with those who had the legal estate, or persons authorized by them; and that the original bargainees being unable to make the payments as required, Cooper stepped in at their instance to advance the purchase money and take the conveyance. Then was not the executory contract consummated and executed, and followed up by actual and continued possession and ownership since 1796? Does this show that the purchasers entered and have held in subservience to any existing title in the demand-

ant or her trustee? If not, how can the demandant contro-
vert the tenant's holding adverse to any thing she claims?

Next it is said that the possession of the premises by the
tenant and those through whom he claims cannot prejudice
the title of the demandant, because she was at the time an *in-
fant*, and became a *feme covert* before she came of age and
continued covert till her divorce in 1817. There is no legal evi-
dence in the case to prove when the demandant came of age,
or when she married. Her decree of divorce states that the
bill was filed in 1816, and that she was married in 1799.
Does this prove her infancy in 1796, when Gould conveyed
to Cooper? or is it competent evidence against the tenant,
who was no party to these proceedings, to prove the time of
her marriage? But admitting, for argument's sake, that she
married in 1799 ; this was three years after Gould's convey-
ance to Cooper, under which an actual adverse possession of
the premises in question then existed. How, then, can her
coverture in 1799, which was her own voluntary act, defeat
the operation of the adverse possession under Cooper's title?
As the possession was exclusive and accompanied with a
claim of absolute ownership, when Cooper entered under the
deed from Gould, he entered upon the legal estate which
was vested in Gould at the date of the conveyance, and the
law is well settled that the statute runs against the holder of
the legal estate ; and if he be a trustee, a court of equity, up-
on application of *cestui que trusts*, will compel him to assert
the legal title.; or in case of his neglect and consequent loss
to the *cestui que trusts*, he is answerable for the loss. So also
in case of a tenant in tail when the statute has run against
him, it is a bar to his successor. 2 Sch. & Lef. 528, 639, 640
and cases cited. C. C. U. S., New-Jersey, in 1821, 2 Gallison,
315. This point is conclusively settled upon authority, by the
supreme court of the United States, in the case of the present
demandant against Huntington, 5 Peters' R. 430 to 648, and
the cases there cited. Here the legal estate was in Schuyler till
1794, and from that time in Gould till he sold to Cooper.
This the demandant's own evidence abundantly proves. How
then can the demandant's alleged infancy or coverture defeat
the operation of the tenant's adverse possession? Again, of

what avail can this last position be to the demandant, if, as has been shown from her own evidence, she has never had a legal estate in fee, or an actual seisin of the premises, to support her writ of right.

It is also said that the statute of limitations gives to the demandant the full benefit of 25 years, exclusive of *all intervening disabilities.* This position is not only not supported by any express authority, but is repugnant to the uniform course of decisions that *cumulative disabilities* are not allowed. 8 Cranch, 12. 2 Wheaton, 25. 2 Paine, 55. Nor is it warranted by a fair and sound construction of the statute, which enumerates the various kinds of disabilities that are intended to be saved by it, without a lisp of an intention to alter or subvert the settled law against allowing cumulative disabilities. Nor can any sensible reason be assigned why a more indulgent construction should be given to the statute in favor of a dormant claim of 24 years and 11 months standing, than in favor of a claim of only 19 years and 11 months standing. On the contrary the construction contended for on the part of the demandant is utterly inconsistent with the avowed and universally acknowledged policy of statutes of repose to quiet titles to land, which have for their object the protection of purchasers and settlers against dormant claims. Nor can the demandant's construction avail her, should it even be considered sound, in the absence not only of any evidence on her part to prove that she ever had such an actual seisin in fee of the premises in question as she has by her count made the foundation of her writ of right in this case, but when, on the contrary, her own evidence proves conclusively that she never had or could have had any such seisin.

The counsel for the demandant contend that the point in issue by the pleadings in this cause is, which of the parties has the greatest *mere right* to the premises in question. Not so. The question presented by the pleadings is, whether the demandant has greater mere right to demand the premises as she demands them by her count, than the tenant to hold the same as he holds them. The demandant then is the actor in this suit, and seeks to oust the tenant, and states in her count the ground upon which she rests her title. What is that

ground ? That she was actually seized in fee of the premises by taking the esplees within 25 years. If, then, she fails to prove such seisen, how does she make out her title upon which she has counted ? and if she does not make it out, how does she show that she has greater right to have the premises as she demands them, than the tenant to hold the same as he holds them ? Is not the tenant's possession a better title to hold the premises than the demandant's title, by demanding the same without any proof of such a title in herself as the law requires to maintain a writ of right ?

But it is said that the doctrine of *actual seisen* in a demandant to maintain a writ of right, means nothing more than a *legal title* to the premises in the demandant. If this position is sound, it is not easy to comprehend why a demandant in a wr't of right is required to count upon an actual seisen by taking the esplees, &c. either in herself or her ancestor ; or why, in case she counts as heir upon the seisen of her ancestor, she is required to show how she is heir, or why the law is settled that she cannot count as devisee upon the seisen of her devisor. The true reason why an actual seisin must be proved by the demandant according to her count is, to enforce the statute of limitation strictly against dormant claims of more than 20 years standing, by requiring a demandant, who assumes to assert her title by a writ of right, to prove strictly that she has been in the actual enjoyment of the premises within the time allowed her to bring a writ of right. And this accords with the language of our statute, 2 R. L. 1813, p. 185, § 2, that " no action for the recovery of any lands, &c. shall hereafter be maintained, unless on a seisin or possession thereof, either of the plaintiff, &c. or of his ancestor, within 25 years, &c. ; and if any such action be brought, &c. and such seisen or possession be not proved, the plaintiff and his heirs, &c. shall forever thereafter be barred from bringing such action, &c." But it has been urged that the doctrine of actual seisen cannot apply in case of *wild lands*. Why not ? If lands are actually wild and unoccupied, the law casts the seisen upon the person having the title ; and in the absence of an actual occupancy, there can be no necessity of a resort

Vol.XII. 83

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

to a writ of right, inasmuch as the owner's right of entry is not impaired by an adverse possession ; whereas the bringing of a writ of right and counting upon the demandant's seisin within 25 years seems to concede that at the time of bringing the action, his seisin has been broken in upon by the tenant. Indeed, it is not easy to apprehend against whom a writ of right is to be bought for the recovery of lands which lay wild and are not actually possessed by any one. It does not, however, lay in the mouth of the present demandant to urge this reasoning in support of her writ of right, when, from her own evidence, it appears conclusively that she never had a legal title or actual seisin of the premises in question and the proof before the court is equally conclusive that the actual seisen of the premises under a legal title *has been in the tenant* and those under whom he holds about 36 years before she brought this action.

It is also urged that no new trial can be granted on a writ of right, except for misconduct or corruption in the grand assize. The authority relied on to support this position, viz. 2 W. Black. 941, disproves it. In that case the tenant moved for a new trial, because, 1. The verdict was against the weight of evidence, and 2. The verdict being conclusive upon the right, the tenant ought not to be bound by a single trial ; but the court denied the motion, because they were satisfied with the verdict upon the evidence, and they observed, as to the conclusiveness of the verdict, that the law made it so, and the court could not presume to be wiser than the law. They however added, that it might be doubted whether a new trial ought to be granted on a writ of right, after a trial at bar ; but upon this point they say they give no final opinion, for cases might happen *in which a new trial might be necessary to prevent manifest injustice.* This point seems to be put at rest by our revised statutes of 1801, 1 R. S. 395, § 8, which expressly gave to the *mayors' courts* of the cities within this state, and to the courts of *common pleas* in the several counties, jurisdiction to try and determine all actions, *real*, personal and mixed, arising in any of the said cities or counties, *with power to grant new trials* in all cases where they should find it necessary, provided that no new trials should be granted by the

courts of common pleas except for irregularity, unless one of the judges present and concurring was of the degree of a counsellor, &c. This special provision in favor of the inferior courts seems to show, very satisfactorily, that the power of the supreme court to grant new trials in real actions was then in existence; and no good reason can be imagined why it should be otherwise, inasmuch as the granting of new trials is essentially necessary for the purposes of justice.

*By the Court*, Sutherland, J. A writ of right is the highest writ in the law, and lies not for the recovery of any estate less than a fee simple. 3 Black. Comm. 193. Booth on Real Act. 84. It regards the *legal* estate only, and has nothing to do with mcre *equitable* interests. Even in the possessory action of ejectment, the legal title always prevails; much more in this action, (which is brought after the ordinary possessory remedies are lost by lapse of time or otherwise,) in which the right of possession can be established only by showing a full and absolute right of property. Our inquiry then is for the legal title. If the demandant never acquired that, however strong and persuasive her equities may be, or may have been, she cannot succeed in this action or in the former.

Admitting, for the present, that Gen. Bradstreet, acquired a legal estate in the Springfield patent, by way of resulting trust, under the purchase made by Gen. Schuyler, I shall, in the first place, inquire what became of that estate upon the death of Gen. Bradstreet. To whom did it pass under his will? Did it vest in his daughters, Agatha and Martha, or in his executors, Schuyler and Smith? The will, so far as it relates to this question, is as follows: " All the rest of my estate, real and personal, I devise and bequeath to my two daughters, equally to be divided between them, as tenants in common, in fee; but I charge the same with the payment of £100 sterling per annum to their mother during her life. *Notwithstanding the former devise* for the benefit of my wife and daughters, I empower my executors to do all acts and execute all instruments which they may consider to be requisite to the partition of my landed estate. *And I devise the same to them as joint tenants to be by them sold at such time and in such man-*

ner as they shall think most for the interest of my daughters ; to whom the net produce shall be paid in equal shares ; the sum of £100 sterling per annum being first deducted, or a capital to secure the same, set apart for an annuity to my wife as aforesaid." It is very clear upon authority, that the terms employed in the devise to the executors are such as would give them a legal estate in fee, independently of the doubt as to the actual intentions of the testator, arising from the previous devise to his daughters. The word heirs is not necessary in order to the carrying of a fee in a will, although it is indispensable for that purpose in a grant. Any other terms or provisions, which clearly indicate the intention of the testator to transfer a fee, are sufficient.

Thus the word estate or estates in a will carries a fee to the devisee. In the *Countess of Bridgwater* v. *Duke of Bolton*, 1 Salk. 237, the terms of the will were : " *all other my estate, real and personal,* I give to my son-in-law, J. S." Holt, Ch. J. remarked, that the word *estate* was *genus generalissimum*, and included all things, real and personal ; that it was not only a designation of the thing devised, but also of the testator's interest in it, and covered the whole. In *Barry* v. *Edgeworth*, 2 P. Wms. 523, the terms of the will were : "I devise all *my land and estate in D., to J. S.*" The question was, whether J. S. took more than a life estate ; and it was held that these terms were not only descriptive of the lands intended to be devised, but also of the testator's interest therein, and that a fee passed. The master of the rolls remarked that the case of the *Countess of Bridgwater* v. *Duke of Bolton*, had settled the law on this point : that a devise of all one's real estate, comprehends not only the thing, but also the interest in it. In *Roe* v. *Harvey*, 5 Burr. 2638, Lord Mansfield said, that the word *estate* carried every thing, unless restrained by other expressions. In *Roe* v. *Wright*, 7 East, 259, the terms of the will were : " I give, devise and bequeath unto my grand-son, John Wright, *all my estate, lands, &c, known and called by the name of the Coal Yard, in the parish of St. Giles.* It was admitted that the word *estate* in a will generally comprehended not only the subject matter of the devise, but also the devisors interest therein. But it was contended, that in this

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

case, when taken in connection with the words which immediately followed, *known and called*, &c. it was to be considered as merely descriptive of the name and local situation of the thing devised. Lord Ellenborough, however, who delivered the opinion of the court, rejected that construction, and held that a fee passed to the devisee. In *Holdfast* v. *Marten and another*, 1 T. R. 411, the terms of the devise were "*I give and bequeath to Mrs. Marten my estate at Braywick.*" It was the unanimous opinion of the court of king's bench that Mrs. Marten took a fee by virtue of the word estate. *Buller, J.* remarked that the word *estate* was the most general word that could be used ; that so far from its being necessary to add words of inheritance to make it pass a fee, words of restraint must be added to make it carry a life estate ;. for it is *genus generalissimum.* In *Tuffnel* v. *Page*, 2 Atkyns 37, the words were, "*My estate in Kirby Hall*, near Henningham Castle, I give to my brother." Lord Hardwicke held that not only *the land*, but all the testator's interest in it, passed ; for although the terms imported a locality, the testator meant his *interest* too. *Fletcher* v. *Hinton*, 2 T. R. 656, it was held that the word *estates* in a will would carry a fee, as well as *estate*, although Lord Hardwicke, in *Goodwyn* v. *Goodwyn*, 1 Ves. 229, had expressed a doubt upon the subject, and remarked that *estate*, in common parlance, means a description of land. In *Telly* v. *Simpson*, cited in 2 T. R. 659, note b., Lord Hardwicke, however, seems to have entertained no doubt that the fee would pass under the word estates, unless restrained by the context. Cases upon this point might be indefinitely extended. Cas. Temp. Talb. 157, 284. 3 P. Wms. 295. 3 Atk. 486. 2 Vesey, 48. 3 Wils. 414. Cowp. 352, 657. Dougl. 734. In *Bailis* v. *Gale*, 2 Vesey, 48, a devise *of all that estate I bought of Mead*, was determined by Lord Hardwicke to carry a fee.

This doctrine was considered by the supreme court of the United States, in *Lambert's Lessee* v. *Paine*, 3 Cranch, 97. It was discussed with great ability by the counsel. The words there were, "*I give to Doctor George Gilmer all the estate called Marrowbone, lying in Henry county, containing by estimation* 2585 *acres.* It was argued with great force, or at least great

plausibility, that the word estate here was descriptive mere-
ly of the land, and not of the testator's interest in it; but the
court held it to have been used in its technical sense, and that it
carried a fee to the devisee. *Vide Jackson* v. *Robins*, 16 Johns.
R. 535, 587, 8, where most of the preceding cases are discuss-
ed by the counsel, and reviewed by Chancellor Kent.   4 Kent's
Comm. 534, et seq.   2 Preston on estates, ch. 6, from p. 68 to
288.   1 have cited these cases, not so much for the purpose of
establishing the general principle, that the word *estate* in a de-
vise carries a fee, as with a view to repel the suggestion
which might be made, that the term *landed, estate*, which is
used in this will, was intended merely to be descriptive of the
realty, as distinguished from the personalty, and had no refer-
ence to the quantum of interest.   A conclusive answer to such
a suggestion, if it should be made, will be found in several of
the preceding cases.

But the executors took a fee in the testator's landed proper-
ty, not only by virtue of the term *estate*, but also by *necessary
implication*, from the power given them to sell and dispose of it.
Chancellor Kent states the principle upon this subject with
great accuracy and perspicuity, in the case of *Jackson* v. *Rob-
ins*, 16 Johns. R. 588, in which the construction of Lord Stir-
ling's will was involved. He says, " It may be laid down as an
incontrovertible rule, that where an estate is given to a person
generally or indefinitely *with a power of disposition*, it carries a
fee; and the only exception to the rule is, where the testator
gives to the first taker an *estate for life only, by certain and ex-
press words*, and annexes to it a power of disposal.   In that
particular and specific case, the devisee for life will not take
an estate in fee, notwithstanding the distinct and naked gift
of a power to dispose of the reversion."   This doctrine has the
authority of Lord Coke, Co. Litt. 9, b., who says, that an estate
of inheritance may pass without the word *heirs :* as if a man
devises twenty acres to another, and that he shall pay to his
executors £10 for the same, hereby the devisee hath a fee
simple, by the intent of the devisor, although it be not the
value of the land.   So it is if a man devise lands to another
in perpetuam, *or to give and to sell* , a fee simple doth pass by
the intent of a devisor.   Where A. devised his lands to B.

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

to give, sell, and do therewith at his pleasure, it was held that the devisee took a fee simple. Bacon's Abr. tit. Devise, pl. 30. Where A. devised lands to his wife, to dispose and employ them on her and her son at her will and pleasure, it was decided that she took an estate in fee. Moore, 57. In *Timewell v. Perkins*, 2 Atk. 102, the devise was as follows: "I give my houses in Broad-street to M. T. for her own use, to give away at her death to whom she pleases." Lord Hardwicke held that these words created an estate in fee. *Goodtitle, ex dem. Pearson* v. *Otway*, 2 Wils. 6. Cruise. Dig. tit. Devise, ch. 11, § 11. 12, et seq. Com. Dig. tit. Devise, n. 2, 4, 12. In *Jackson ex dem Bush* v. *Coleman*, 2 Johns. R. 391, the terms of the devise were, "I give to my wife the use of all my real and personal estate, to use and dispose of at her pleasure." The wife was held to take a fee by virtue of the power of disposition. In all these cases the devise was general, but where *it is in terms for life* the devisee will not take a fee, but only an estate for life, with a power to dispose of the reversion. Thus in *Thomlinson* v. *Dighton*, 1 Salk. 240, the devise was to A. *for life*, and then to be at her disposal to any of her children who shall then be living. A. took but an estate for life, with power to dispose of the fee. Parker, Ch. J. said, that the estate here given was express and certain—an estate for life; and that the disposing power was a distinct gift, and came in by way of addition—that it could not convey the estate. But where the devise was to A. in general terms, with power to sell and devise, as he was empowered to convey a fee he is construed to have one. The power is held to convey the estate. In *Croppling* v. *Croppling*, 2 Cox, 395, the testator devised a freehold estate to his wife *for life*, after which followed these words: "and she shall dispose of the same among my children by her, at her decease, as she shall think proper." The wife made no disposition of the estate, and it was held that the estate descended to the heir at law. *Reid* v. *Shergold*, 10 Ves. 370, is to the same effect. A distinction exists between *a devise* to executors with power or direction to sell, &c. and a mere direction to sell without any devise in terms. All the cases agree, that in the former case the lands vest in the executors in fee; in the latter they vest in the heir until the power is

executed. The one is a power coupled with an interest, the other a mere naked power. Cruise's Dig. tit. 38, Devise, ch. 5. Powell on Dev. 300, et. seq. *Bergen* v. *Bennett,* 1 Caines' Cas. in Err. 16, opinion of Kent, J. *Jackson* v. *Burr,* 9 Johns. R. 104. This question was much discussed in the case of *Jackson* v. *Schauber,* 7 Cowen, 193, and 2 Wendell, in error, involving the construction of the will of William Apple : all the authorities upon the subject are there collected. The will in that case gave the executors an authority to sell the real estate, but contained no devise to them in terms. The supreme court held it to be a naked power, and that the land descended to the heirs. The court of errors, however, held, that as it was apparent from other parts of the will that the testator intended that the estate should not descend to his heirs at law, it vested in his executors under the power to sell. It is unnecessary, however, to pursue this distinction, as there is in this case an express devise to the executors. If they took any thing under the will, therefore, it was an estate in fee subject to the trust declared in the will, and not an estate for life.

Although the will is inartificially drawn, I think it admits of very little doubt that the testator *intended* that the title to his landed estate should vest in his executors, and not in his daughters. Literal effect cannot be given to all the terms of the will, upon any construction of it. There is, in the first place, a clear devise to the daughters; and then a devise, in equally clear and explicit terms to the executors, with directions to sell the estate, and divide the net proceeds between the daughters, in equal shares. It is evident that the testator, or whoever drew the will, was aware that the devise to the executors was incompatible with the previous devise to the daughters, for he says, " *Notwithstanding the former devise* for the benefit of my wife and daughters, I empower my executors to do all acts, &c., and execute all instruments, &c. ; and I devise the same to them as joint tenants, to be by them sold," &c. The clear import of this phraseology is, that the previous provision is in no respect to affect or prevent the legal operation of the latter ; that so far as the first devise was inconsistent with the latter, it must yield to it : *Notwithstanding* what I have already said, still I devise my landed

estate to my executors. The intention of the testator to give the whole beneficial interest in his estate to his daughters, is carried into effect upon *either construction* of the will; for if the executors take the estate, it is to be sold, and the produce divided between the daughters—they are but different modes of accomplishing the same ultimate purpose. But where the provisions of a will are so repugnant that both cannot stand, the latter, I apprehend, must prevail. This is the doctrine of Lord Coke. In 1 Inst. 112, b., he says, "Where there be divers devises of one thing in the same will, the last devise taketh place. *Cum duo interse pregnantia reperientur in testamento ultimum ratium est.* It is true, in the note upon this passage, it is said that the authorities are not consistent upon the effect of two inconsistent devises in the same will. Some hold with Lord Coke, that the second devise revokes the first; others think that both devises are void on account of the repugnancy, but that the opinion supported by the greatest number of authorities is that the two devisees shall take in moieties. Hargrave & Butler's Notes, n. 144. Vide English ed. of Plowd. 541, where the authorities are collected. Roberts on Wills, 430, note Powell on Dev. 411. Whatever the rule may be, where the question arises upon a simple devise of a particular thing or estate, there can be no such thing as taking by moieties in a case like this. It seems to me, in the nature of things, that in such a case the last devise must prevail.

The premises in question having thus vested in fee in Gen. Schuyler, under the will of Gen. Bradstreet, the next inquiry is, how did he dispose of the estate? It appears from Schuyler's answer to the bill filed against him by Evans and wife, in 1788, that he had anxiously consulted the most eminent counsel in the state, in relation to the most safe and proper manner of discharging himself from the burden of this trust. Letters are set forth in his answer, from Alexander Hamilton, Samuel Jones and Richard Harrison, in answer to his inquiries upon this subject, and giving it as their opinion, that he ought to sell the interest of Bradstreet; that Mr. Ludlow one of the attorneys of Sir Charles Gould, might and would become the purchaser; and that then there would be no difficul-

ty in making a final settlement with Evans and wife, in rela-
tion to their interest, and with Sir Charles Gould as the rep-
resentative of the other parties in interest, under the wills of
Mrs. Livius and Martha Bradstreet. This arrangement, how-
ever, was not carried into effect, in consequence of the refusal
or inability of Evans to give satisfactory security to Schuyler,
against any claims or debts which might arise against the es-
tate of Gen. Bradstreet. Gen. Schuyler also states in his an-
swer, as an evidence of his fidelity in the discharge of his trust
that he had referred several persons, who had applied to him
to purchase parts of the said real estate, to Evans, and to
Messrs. Ludlow and Gould, (the attorneys of Sir Charles
Gould,) informing the applicants that he would confirm what-
ever agreement they might respectively enter into with Evans,
Ludlow and Gould. No settlement, however, appears to have
been made between Schuyler and the heirs of Bradstreet, nor
any conveyance to have been executed by Schuyler until the
16th day of May, 1794, when the deed to Mrs. Evans and to
Edward Gould, as the attorney of Sir Charles Gould, bears
date. The general characteristics of this deed are, that it
purports to be a deed from Schuyler, as the executor of Brad-
street, of the one part, and Agatha Evans, (who had then be-
come a widow,) one of the daughters of Bradstreet, and *Ed-
ward Gould, attorney to Sir Charles Gould,* the only executor
of the last will and testament of Martha Bradstreet, deceased,
the other daughter of Bradstreet, of the other part. It recites
the will of Bradstreet, and sets forth all its material provisions ;
that at the time of the making of said will, he, Schuyler, was
seised in fee of certain lots of land, particularly enumerating
them, and that as to one undivided sixth part of said lots of
land, he was seised in trust for Bradstreet ; that Agatha
Evans, one of the grantees, was one of the daughters of Brad-
street, and that the other daughter, Martha, made her will
on or about the 15th of May, 1781, by which she divided her
estate between her sisters, Mrs. Evans and Mrs. Livius, and
Samuel and Martha Bradstreet, the children of her brother
Samuel; *and that she appointed Sir Charles Gould sole executor
of her will, and empowered him to sell and dispose of all her real
estate* in North America, or elsewhere, and to execute convey-

ances for the same. It then states that partition had been made of the several lots, and enumerates the lots which fell to him as trustee for Bradstreet; and that the indenture was made, as well with a view to *invest* the said *Agatha Evans* with a legal title to her proportion of said land, &c. as to convey the rest and residue thereof to the said *Edward Gould, in trust for the several persons who may be entitled thereto,* under the will of Martha Bradstreet. The deed then grants and conveys two third parts of the lands therein described to Mrs. Evans, and the *remaining one third to Edward Gould, his heirs and assigns, but in trust to sell the same and divide the proceeds, in conformity with the provisions of the will of Mrs. Bradstreet,* and provides that the conveyances to be executed by Gould should express upon their face the said trusts as to the one third part of said premises.

In relation to this conveyance, the counsel for the demandant contended, that nothing passed under it to Edward Gould; that Schuyler had only a power to sell under the will of Bradstreet; that this will was referred to in the deed, and therefore the extent of Schuyler's power was brought home to the knowledge of Gould; that this conveyance was not a sale, and therefore not an execution of the power, and of course the grantee acquired nothing. This objection assumes that Schuyler had a mere naked power to sell, and if that were true, there would be force in the objection. But if I have been successful in showing that Schuyler took an estate in fee under the will of Bradstreet, this objection is disposed of; for if he had the fee, he had of course the power of alienation, for it is a necessary incident of that estate. The direction in the will that he should sell the estate at such time, and for such price as he should think expedient, and divide the proceeds between the daughters of the testator, did not confer upon him a power to sell—that he had before; but it was a mere declaration of the trust, under and subject to which he took the estate; and *it passed to the grantee* subject to that trust; not merely by virtue of the reference to the wills of General and Martha Bradstreet, but by the express terms of the deed itself.

If Gould did not acquire the legal title under this conveyance, then, so far as the paper title is concerned, independent-

ly of the question of adverse possession, it still remains in the heirs of Schuyler; for there is no evidence of any other conveyance by him or his heirs. *Gould* is the only medium through which the demandant pretends to have acquired the legal estate in the premises in question, if it was ever vested in Gen. Schuyler. She would effectually destroy her own title, therefore, by showing that nothing passed by this conveyance. I apprehend the demandant is not now at liberty to deny that Edward Gould was the lawful attorney and agent of Sir Charles Gould, and that he took under the deed of Schuyler all that it professed to convey to him, in trust for the purposes of the will of Martha Bradstreet. In 1803, the demandant and her then husband, Matthew Codd, filed a bill in the court of chancery of this state, against Edward Gould and Samuel Bradstreet. The will is not set forth in the case, but it would appear from the decree that one object of the bill was to determine the respective rights of the demandant and her brother Samuel, under the will of Mrs. Livius, to the property in the possession of Gould, as trustee under the deed from Schuyler. Mrs. Livius was one of the devisees under the will of Martha Bradstreet. She gave her one third of her estate, the demandant and her brother another third, and the residue to Mrs. Evans. The deed from Schuyler conveyed to Mrs. Evans all her share, under the wills of her father and Martha Bradstreet, and to Edward Gould all the residue of the estate, in trust for the other devisees of Martha Bradstreet, to wit, Mrs. Livius and the demandant and her brother. Edward Gould in this manner became the trustee of Mrs. Livius. Mrs. Livius subsequently died, and gave all her estate to the demandant and her brother Samuel Bradstreet; and this bill was filed against Gould and Samuel Bradstreet probably to determine the respective rights of the demandant and her brother to the property thus held in trust by Gould, and to compel him to account, and to convey to her whatever of her estate was still in his hands. The decree accordingly adjudges and directs that Gould do transfer to Matthew Codd, the demandants' husband, all the personal estate in his hands, *as trustee of Elizabeth Livius, deceased,* mentioned in the pleadings; and that he transfer and convey unto the com-

plainant, Martha Codd, all the *real estate vested in him as trustee aforesaid;* but that nothing therein contained shall make him personally responsible for any of the said trust property *which may have been converted into money,* and for which he would have been liable, if he had not become a bankrupt and obtained a certificate of discharge ; and the decree directs that *each party shall pay his own costs.* The decree further directs a reference to a master, to take an account of the real and personal property in the possession of Gould, *as trustee as aforesaid,* and not converted into money before his bankruptcy, and to direct *a proper transfer and conveyance* to the complainant as aforesaid. It is very evident, from the decree, that Gould was proceeded against, and charged *as the rightful and legal trustee of Mrs. Livius,* and not as an intermeddler with her estate. He is described as such trustee, and is not charged with costs, which he unquestionably would have been, had he been considered an intermeddler or wrong doer. But all doubt upon this subject is removed by the conveyance which was executed by Gould to the demandant, in obedience to the decree, and the form and substance of which it is to be presumed were settled by a master of the court as the decree directed. This conveyance bears date the 22d of October, 1804. It commences by setting forth, by way of recital, all the material provisions in the deed from Schuyler to Gould, of the 16th of May, 1794, to wit, among other things : 1. That the said Edward Gould was attorney to Sir Charles Gould ; 2. That the deed was made as well to invest *Agatha Evans* with a legal title to her proportion of the lands devised to her by the wills of John Bradstreet and Martha Bradstreet, as to convey the residue of the land, &c. devised thereby *to the said Edward Gould, in trust for the several persons who might be entitled to the benefit thereof, under the will* of the said Martha Bradstreet ; 3. A conveyance of one third *thereof to Gould, upon the said trust;* 4. That the said Martha, the demandant, since the execution of the said release from Schuyler, had, by virtue of the last will and testament of Elizabeth Livius, become entitled to all her interest in the said premises, so released as aforesaid by Schuyler to Gould, in trust, and not converted into money ; 5. That said Gould had become a bankrupt; 6. That by the

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

aforesaid decree, he had been directed to convey and account as therein stated. It then proceeds to convey to the demandant and to her heirs and assigns, in consideration of the premises, and in pursuance of the decree, " *all the real estate held by him at the time of his becoming a bankrupt as aforesaid, as trustee as aforesaid, for the said Elizabeth Livius, by virtue of said indenture of release*, executed by Schuyler as aforesaid, and the several wills therein referred to ; and also all the real estate held by him, the said Edward Gould, at the time of his becoming a bankrupt, &c. *as trustee for the said Martha, by virtue of the said several indentures and wills last referred to*. This decree and deed were given in evidence by the demandant herself, as links in her chain of title, and are relied upon by her for that purpose ; and she certainly cannot be permitted to deny the material facts which it alleges, either by way of recital or otherwise, to have existed, and without the existence of which she acquired nothing under the deed. It is not necessary to go into a discussion of the doctrine of *estoppel* to establish this proposition. The principle is well stated by Chancellor Jones, in *Sinclair* v. *Jackson*, 8 Cowen, 586. It is this : " That a man who admits a fact or deed, in general terms, either by reciting it in an instrument executed by him, *or by acting under it*, shall not be received to deny its existence." In *Shelly* v. *Wright, Willes, J.*, it was held that a party executing a deed was estopped by the recital of a particular fact in that deed to deny that fact ; and several of the old authorities are referred to by Chief Justice Willes : Cro. Eliz. 756, 757 ; Alleyn, 52 ; 2 Leon. 11 ; 1 Roll. Abr. 870, 872 ; Co. Litt. 352, b. ; Comyn's Dig. Est. a. 2 ; 2 P. Wms. 432 ; *Dann ex. dem. Colden* v. *Cornell*, 3 Johns. Cas. 474 ; and *Carver* v. *Jackson*, 4 Peters, 83, et seq. where the doctrine of estoppel is considered at large, and most of the cases are referred to. An estoppel is reciprocal, and binds both parties. Com. Dig. Estoppel, E. Co. Litt. 352, a. If Edward Gould could not be permitted to deny that he was the attorney of Sir Charles Gould, and took, under the deed of Schuyler, all that it professed to convey to him, in trust for the purposes of the will of Martha Bradstreet, the demandant, I apprehend, is equally concluded from denying those facts, by the decree in chance-

ry and the deed of Gould, in both of which they are affirmed. It is true, as a general principle, that a *feme covert* is not bound by matters of estoppel accruing during coverture. Com. Dig. Estoppel, c. But where a feme covert goes into a court of chancery to ask its aid on the ground of the existence of particular facts, and obtains the relief sought for, I apprehend she will be held precluded from subsequently denying those facts. She acts under the protection of the court, and will be bound precisely as though she were a *feme sole.* But whether she would be bound or not by way of estoppel, by the mere force of the decree and the contents of the deed, if she had subsequently done nothing to recognize or affirm them, yet when she introduces and relies upon them as evidence, she makes them evidence in full, and their contents may properly be used against her as evidence. The legal estate in the premises in question then passed to Edward Gould, under the deed of Schuyler subject to the trusts therein declared.

Edward Gould in his own right, and Edward Gould, Richard Harrison and Charles Wilkes, as the executors of Agatha Evans, by deed dated the 11th June, 1796, conveyed the whole of lot No. 32 to William Cooper. Mrs. Evans it will be recollected, owned three fourths of the estate of her father Gen. Bradstreet. She made her will on the 29th November, 1794, by which, after certain bequests, she devises the whole of her estate to Richard Harrison, Edward Gould and Charles Wilkes, their heirs and assigns, upon certain trusts declared in her will, and appointed them her executors. These executors, then, and Edward Gould held the whole legal estate of the entire lot No. 32, and their deed of the 11th June 1796, purported to convey the whole to William Cooper. It is objected to this deed, 1. That it was a deed from Gould *in his own right,* and *not as trustee* of the demandant, and therefore did not convey her interest as trustee ; 2. If it would otherwise be held to cover his trust interest, yet, as the deed from Schuyler, under which he derived all his interest and authority in the premises, expressly required him to insert the trusts upon which he held the estate in all the conveyances which he might make of the same, this deed was void on account of the omission to set forth those trusts upon the face of it ;

and 3. That the certificate of proof was insufficient to entitle it to be recorded. The deed itself is not set out in the case. All that is said of it is, that it was a deed from Edward Gould in his own right, and from Gould, Harrison and Wilkes as executors of Mrs. Evans, for the whole of the lot, &c. Now it does not necessarily follow, from this statement, that the trusts upon which he held the estate were not stated in the deed. This phraseology may have been used merely to show that he was a party to the deed in two capacities, as representing two distinct interests. The objections made to the introduction of the deed were simply, that the certificate was insufficient, and that *no right* had been shown in the grantor. However, admitting the fact to have been as it is now assumed to have been, there is no force in the objection. Gould was not a mere trustee; he had an estate in fee in the premises, with express power or directions to sell, and apply the proceeds in a particular manner. A trustee of this description need not set forth the trusts in his conveyances. *Cui bono?* Why should he? He has the absolute power of sale, and if there is no fraud, the trust attaches only to the proceeds. 8 Cowen, 571, 584, and the authorities there cited. There is no pretence, that Gould had or claimed any interest in these premises, except under the deed of Schuyler; his conveyance was undoubtedly intended to convey that interest, and such I think was its legal effect.

The provision in the deed from Schuyler to Gould, that he should set forth the trusts in his conveyances, &c. I apprehend, is to be considered as directory merely, and not as a condition precedent. Its omission did not affect the validity of the conveyance at law; but neither at law nor in equity can the demandant avail herself of it. Under the decree of the court of chancery in favor of the demandant against Gould, he was directed to account for the proceeds of all sales previously made by him. This was in effect a ratification of those sales. The demandant submitted to the decree, accepted a conveyance under it, and although it does not appear that an account was actually stated between her and Gould, such is the legal presumption. In judgment of law she has received the proceeds of this sale, and cannot now object to its regularity.

ALBANY
Oct. 1834.

Bradstreet
v.
Clarke.

The certificate of proof of the deed was sufficient to entitle it to be read. The acts then in force in relation to the proof and acknowledgment of deeds, simply required, in order to entitle them to be recorded, " that they should be duly *acknowledged* by the party or parties executiug the same, or the execution thereof be duly proved by one or more of the subscribing witnesses to the same, before one of the justices of the supreme court, a master in chancery, &c. 2 Jones & Varick's Rev. Laws, 266. It left the form of the certificate to the discretion of the officer before whom the deed was proved. The proof in this case was taken by Chancellor Kent, then a master in chancery : and the certificate states, that " P. E. Fleming, one of the subscribing witnesses to the deed, appeared before the officer, who, being sworn, said that he saw the grantors therein named severally execute the same for the uses therein mentioned ; and that A. Kirkpatrick, with himself, subscribed their names thereto as witnesses. This was abundantly sufficient under that act. Subsequently the legislature enacted " that no proof of a deed should be taken, unless the officer taking the same should *know* the person making such proof, or have satisfactory evidence that he was a subscribing witness to such deed, and that such witness knew the grantor, and required that such knowledge or evi dence should be inserted in the certificate. 1 R. L. of 1801 p. 478. Previously to this, it was not necessary *to set forth in the certificate all the circumstances or evidence constituting the due proof.* The fact that the officer knew the witness was implied in the assertion that A. B., *one of the subscribing witnesses*, appeared before him, and the fact that such witness knew the grantors was also implied in the declaration under oath, *that he saw them execute the deed.*

Having thus traced the legal estate in the premises in question down to 1796, and having shown it then to have vested in William Cooper under the deed from Gould and the executors of Mrs. Evans, I deem it entirely unnecessary *to* examine the subsequent conveyances from Cooper and his grantees and executors, by which the tenant contends he obtained a regular and valid paper title. We have already traced it one stage beyond the point from which the demandant con-

tends that it came to her. We have shown that it passed from Edward Gould in 1796, and could not therefore have been conveyed by him to the demandant in 1804. What became of the title subsequently to the conveyance to Cooper, is a question in which the demandant has no interest. She must recover in this action, as in the action of ejectment, on the strength of her own title, and cannot rely upon the defect of title in her adversary.

From 1796 down to the commencement of this action in 1829, a period of thirty-three years, these premises have been actually occupied and improved under a claim of absolute title and ownership, by virtue of this conveyance to Cooper; and this *possession*, from its commencement to the present time, has been marked by all the characteristics necessary to render it *adverse* to all the world. It cannot be necessary for me to go into a review of the cases upon this subject. If there is any doctrine familiar to the profession in this state, and to this court, above all others, it is the doctrine of adverse possession. To constitute an adverse possession, it is not necessary that there should be a rightful title. All that is necessary is, that it should be a possession taken and held in good faith under claim and colour of title, and exclusive of any other right. The defence of adverse possession assumes that the defendant has not a valid legal paper title; if he had, he need not rely upon the length of his possession. *The fact of possession and the quo animo, it was commenced and continued are the only tests.* Teller v. Burtis, 9 Johns. R. 174. *Smith* v. *Lorillard*, 10 id. 356. *Jackson* v. *Wheat*, 18 id. 40. *Jackson* v. *Newton*, id. 355. *Dunbar* v. *Todd*, 2 Caines, 183. *Jackson* v. *Ellis*, 13 Johns. R. 118. *Livingston* v. *The Peru Iron Co.* 9 Wendell, 511. He need not even produce the deed under which he claims; and if, when produced, it is defective as a deed, as for the want of a seal or otherwise, it will not destroy the effect of the defendant's possession. 18 Johns. R. 40, 361. *Jackson* v. *Le Frambois*, 8 Cowen, 594, 596. It was said by the counsel for the demandant, that, as Edward Gould, the grantor of Cooper, professed to act only as the attorney for Sir Charles Gould, the executor of Martha Bradstreet's will, under which the demandant claims, the possession under his

ALBANY,
Oct. 1834.

Bradstreet
v.
Clarke.

conveyance can never become adverse to the demandant—that they both claim under the same title. This is an entire mistake. A conveyance by an attorney or agent, professing to convey the whole and absolute title, is a good foundation for an adverse possession; and it is perfectly immaterial for that purpose whether he had the requisite authority to convey or not, for, although a deed professedly executed under a power will not pass the estate, if the power did not in fact exist, yet it is sufficient to give color to the grantee's claim of title, and stands upon the same footing with any other deed, which, for the want of title in the grantor, or for any other defect, does not actually pass the estate. This point was expressly adjudged in *Jackson* v. *Johnson*, 5 Cowen, 101. 3 id. 229. 5 Day, 181. The possession of a grantee is as adverse to his grantor, and to any other person claiming the same title, as it is to all the rest of the world. This was expressly held in *Pawlet* v. *Clarke*, 4 Peters, 504, and *Bradstreet* v. *Huntington*, 5 id. 429, where it is correctly said by counsel that a purchaser does not take his possession in subserviency to the title of his grantor; he holds for himself and adversely to his grantor, and the case of *Jackson* v. *Newton*, 18 Johns. R. 362, and the other authorities there cited, fully sustain this position. This must be so, upon the principle which lies at the foundation of the doctrine of adverse possession. It is perfectly immaterial, therefore, so far as the general doctrine of adverse possession is concerned, whether Gould had the legal estate, with power to convey these premises, or not, when he executed the deed to Cooper. Cooper entered, claiming the title under it, and it was at all events sufficient to give color to the claim. But when we come to consider whether the defendant is protected against the running of the statute by her disabilities of infancy and coverture, it becomes very important to determine in whom the legal estate was when the adverse possession commenced. The statute runs only against the legal estate, and if that was in the demandant when the conveyance to Cooper was made, and she was then under one or more disabilities, the operation of the statutes as against her would have been suspended until those disabilities ceased. But if I have been successful in showing that it was

not in her, no matter where it was, whether in Schuyler or Gould, the statute having commenced running, its operation would not be suspended by any disability under which the demandant might be laboring when a right of entry subsequently accrued to her, admitting that she did subsequently acquire it. This whole doctrine is fully considered and settled in the case of *Jackson, ex dem. Swartwout and wife*, v. *Johnson*, 5 Cowen, 74; and I deem it unnecessary to dwell longer upon it.

Whether the executors of Mrs. Evans conveyed to Cooper with or without the *consent* of the Symingtons, is a matter with which the demandant has no concern. The Symingtons never having objected to the sale, the legal presumption is that they assented to it and received from the executors their distributive share of the proceeds. As to the demandant it is *res inter alios acta.*

According to the true construction of the decree of the court of chancery, under which the deed from Gould to the demandant of 22d October, 1804, was given, and of the deed itself, none of the lands previously sold and conveyed by Gould were embraced therein. He was to account for the proceeds of previous sales, and convey all that remained in his hands.

It was suggested by the counsel for the demandant, that the statute of limitations in relation to real actions allowed of *cumulative disabilities.* The language of the proviso affords some color for the suggestion; it is, " that no part of the time during which the plaintiff shall have been within the age of 21 years, insane, *feme covert*, or imprisoned, shall be taken as a part of the said limitation of 25 years." But it is believed that the same construction has uniformly been given to this proviso, in this respect, as to that in relation to possessory actions—that where the statute has once begun to run, a subsequently accruing disability will not impede or suspend it. The counsel cited no authority in support of their construction, and I am persuaded none can be found. There certainly can be no reason for allowing of cumulative disabilities to a real action, which would not apply with equal force to the action of ejectment.

The wills of Mrs. Bradstreet and Mrs. Livius were proper-

ly admitted in evidence. Mrs. Bradstreet's will was admitted
to have been regularly proved in England, and the other was
offered as an ancient deed : and although it had never been
proved, it was admitted that it had been deposited in the
proper office in England, and that liberty had been given
to the demandant to take it from the files of that office; and
it was shown that lands had been held under it in Cosby's ma-
nor, in this state. This evidence brought it within the prin-
ciple which allows ancient deeds of more than 30 years stand-
ing to be read without proof.

Having come to the conclusion that the demandant has
failed to show a legal title to the premises in question, it is not
necessary for me to enter at length into the discussion of the
question, whether a *constructive seisin* alone, resulting from the
proof of a legal title without *actual seisin*, would have entitled
her to recover in this action. At common law *actual seisin*
was undoubtedly necessary to maintain a writ of right. There
is no discrepancy in the authorities upon this point. Lord
Coke, Co. Litt. 293, a, says, "if neither the demandant nor
any of his ancestors were seised of the land within the time
of limitation, he cannot maintain a writ of right, for the
seisin of him of whom the demandant himself purchased the
land availeth not." In *Belville's case*, Coke's R. part 4, p. 9,
it is said : " So the seisin which is requisite in a writ of right
of land ought to be *actual* and *not seisin in law.*" Booth, in
his valuable Treatise on Real Actions, page 111, says : Because
possession is an evidence of right and property, therefore, in
all real actions in the right (except such as are grounded up-
on the seignory, and not upon the seisin of the land as a writ
of escheat, &c. ) for recovery of lands and tenements, the de-
mandant in her count must allege a seisin and taking of the
profits, which is called the *esplees,* so that it must be an *actual
seisin.*" Mr. Sergeant Williams, in a note to *Williams* v. *Gwin,*
2 Saund. 45, b., says: "In order to maintain this action, a
writ of right, the demandant must show an *actual seisin,* either
in himself or his ancestor, by taking the *esplees or profits of the
land ;* therefore it is held that a *purchaser* cannot maintain the
action, except upon his own *seisin.* " I had occasion to refer

to these and various other authorities upon this point, in *Williams* v. *Woodward*, 7 Wendell, 251. We there held that a *devisee* could not maintain a writ of right upon the *seisin* of his testator ; and the English authorities there referred to undoubtedly establish that a *devise*, as such, cannot maintain a writ of right. 2 Sch. & Lef. 104, 604, S. C. 2 Merivale, 255, 273, 304, 329. 1 H. Black. 1. Mr. Justice Story, however, in *Given* v. *Liten and others*, 8 Cranch, 245, referred to several ancient authorities to show, that an *actual entry* and perception of esplees were not in all cases necessary to be proved in order to *show an actual seisin*, even at common law. In Hargrave's Note, 3 Co. Litt. 24, it is said in terms, that an actual entry is not always necessary to give *a seisin in deed ;* for if the land be leased for years, the husband may be tenant by the curtesy without entry or even receipt of rent. So in 1 Co. Litt. § 417, 418, it is said that if a man have occasion to enter into different parcels of lands in divers towns in the same county, an entry into one parcel, in the name of all, will give him a good seisin of all, as if he had entered in deed into every parcel. So of livery of seisin of one parcel in the name of all. And in section 419, it is said that if a man hath title to enter into any lands, and if he dare not enter into the same, or any parcel thereof, for fear of beating, mayhem or death, if he approach as near as he dare, and by word claim the lands to be his, he has as good a *seisin* as if he had entered in fact ; although he never before had possession or seisin of those lands. These cases show, as Judge Story remarks, that there are cases in which the law gives the party a constructive seisin in fact or in deed. The common law regards the nature of the case in the application of its principles. It proceeds by general rules ; but where a literal compliance with those rules is impossible, it accepts a performance which *essentially* accomplishes the original purpose and reason of the rule. The only reason for ever requiring livery of seisin or actual delivery of the possession of land, in order to perfect a title to it, was to make the change of title and possession notorious. It was a public ceremony, supposed to be performed in the presence of the vicinage. The very object of the rule, as Judge Story remarks, was notoriety—to prevent frauds

upon the lands and upon the other tenants ; and he asks, with great force, what notoriety could an entry, a gathering of a twig or an acorn in an uncultivated country, in wild and impenetrable woods, convey, where there were no inhabitants within miles of the place. He says the reason of the rule does not apply to such a state of things ; and the conclusion to which the court in that case came upon this point, was, that a conveyance of wild and vacant lands gives a *constructive seisin thereof in deed* to the grantee, and attaches to him all the legal remedies incident to the estate. This court had previously adopted the same principle in *Jackson, ex dem. Beekman,* v. *Sellock,* 8 Johns. R. 262. It is as clear a doctrine of the common law, that actual entry by the wife or husband is necessary to the completion of a tenancy by the curtesy, as it is that it is necessary to maintain a writ of right ; and yet, in the preceding case, it was held, that where a feme covert was the owner of wild and uncultivated lands, she was to be considered in law and in fact possessed, so as to enable her husband to become a tenant by the curtesy. The wife, in that case, derived her title by will, like the demandant here. She was a devisee. Kent, J., in delivering the opinion of the court, says : " The question is, was she not to be considered as seized in fact of these premises, so as to enable her husband to become a tenant by the curtesy. To deny this, he continues, would be extinguishing the title of tenant by the curtesy, to all wild and uncultivated lands. It has long been a settled point, that the owner of such lands is to be deemed in possession, so as to maintain trespass ; (though at law an action of trespass will not lie on a seisin in law before entry, 3 Black. Comm. 210.) The possession of such property follows the title, and so continues until an adverse possession is clearly made out. This is the uniform doctrine of this court, and there is no reason why the same rule should not apply where the title by curtesy is in question. To require the actual occupation of such lands during the coverture, would be an unreasonable if not an impracticable requisition. The general language of the English cases is, that there must have been an actual entry, but the rule had reference to enclosed or cultivated lands. We must take the rule with such a construction as the pecu-

liar state of new lands in this country require; and this may be done without any departure from the spirit and substance of the English law; and he refers to several cases to show that even in England, where actual entry could not be made, the law excused it. Co. Litt. 29, a. 3 Atk. 469. 7 Viner, 149, pl. 11. We had occasion also to consider this doctrine in relation to the estate by curtesy, in *Jackson* v. *Johnston*, 5 Cowen, 97, and the principle of the case in 8 Johns. R. was recognized as sound. By the statute of uses, 27 H. 8, ch. 10, *cestui que use* is immediately seized and in actual possession, and may maintain assize or trespass against a stranger before entry. Cro. Eliz. 46. 2 Black. Comm. 238. 5 cowen, 98. Com. Dig. tit. Use, 1. Where the title is derived from a conveyance operating under and by virtue of the statute, actual entry therefore is unnecessary; and I agree with Mr. Justice Story, that it will be found extremely difficult to maintain, that a deed or conveyance, which by the *lex loci* gives a perfect title to waste and vacant lands without further ceremony, will not yet enable the grantee to support that title by giving him the highest remedy applicable to it without an actual entry. 8 Cranch, 247. But I forbear enlarging upon this point. My opinion is, that if the premises in question were wild and uncultivated land when the demandant's right of entry accrued, she might maintain this action without actual entry.

The power of the court to grant a new trial in a *writ of right* is too clear to require discussion. There is neither reason nor authority against it. The verdict is against law and evidence, and a new trial must be granted.

New trial granted.